77 N.Y.2d 144 (1990)
In the Matter of the Liquidation of Consolidated Mutual Insurance Company.
Harold J. Levy, on Behalf of Himself and All Others Similarly Situated, et al., Appellants;
New York State Superintendent of Insurance, Respondent.
Court of Appeals of the State of New York.
Argued November 15, 1990.
Decided December 20, 1990.
Michael W. Sculnick, Neal I. Korval and Neil A. Capobianco for appellants.
Richard R. Lutz and Paul S. Grobman for respondent.
Judges KAYE, HANCOCK, JR., and TITONE concur with Judge BELLACOSA; Judge SIMONS dissents and votes to affirm in a separate opinion in which Chief Judge WACHTLER and Judge ALEXANDER concur.
*146 BELLACOSA, J.
Appellants are a certified class of approximately 165 retired employees of Consolidated Mutual Insurance Company (CMIC). CMIC gave them continuation group term life, medical, and health insurance coverage upon their retirements. In May 1979, the New York State Superintendent of Insurance, *147 as liquidator of CMIC (Insurance Law § 7405), terminated all CMIC's "subsisting contracts and other obligations," including the contractual benefits at issue here. Since 1979, the retirees have been seeking restoration of their benefits on the ground that they were given lifetime rights protected against termination by the liquidator-Superintendent as successor to CMIC (see, Levy v Lewis, 635 F.2d 960 [2d Cir]).
A State Supreme Court Referee reported, after a hearing, that the Superintendent had legal authority under the Insurance Law to withdraw the benefits, and specifically stated that language in CMIC's Employee Guidebook unambiguously reserved CMIC's right to terminate. Supreme Court then granted the Superintendent's motion to confirm the Referee's findings and ruled against the retirees.
In affirming, the Appellate Division applied "principles of contract law" to "determine whether the parties intended to create a nonterminable right to these benefits" (154 AD2d, at 593). The Appellate Division held that the "reservation of rights" clause, together with certain other unidentified sections of the Guidebook, were "sufficient to apprise the claimants" that CMIC could terminate these particular plans (154 AD2d, at 593-594) and "adequately reserve[d] [CMIC's and hence the liquidator's] right to terminate" (154 AD2d, at 593 [emphasis added]). The Appellate Division also relied on the unfunded nature of the insurance plans, and on the express mandate of the judicial order of liquidation. We granted leave to appeal and now reverse.
The parties agree that the benefit plans CMIC gave to its retired employees were "welfare benefit" plans under section 3 (1) of the Employee Retirement Income Security Act of 1974 (ERISA) (29 USC § 1002 [1]), but that the retirees were not protected by ERISA's automatic vesting or minimum funding requirements (29 USC § 1051 [1]; § 1081 [a] [1]). However, as the parties also acknowledge, the inapplicability of ERISA's vesting umbrella does not resolve this particular controversy.
Employers can contract to provide nonterminable postemployment welfare benefits to retirees irrespective of ERISA's vesting protection. Retirees seeking to establish entitlement to such benefits by that route bear the initial and extra burden of proving an employer's nontermination intent. In the absence of ambiguity, resolution of this issue turns on the benefit plan documents (Heidgerd v Olin Corp., 906 F.2d 903 [2d Cir]; Moore v Metropolitan Life Ins. Co., 856 F.2d 488 [2d Cir]), *148 and the unfunded status of a plan is not determinative or relevant.
CMIC's Employee Guidebook, a 32-page booklet summarizing a variety of CMIC-provided employee benefits, is the primary plan document relied on by the retirees. With respect to health and medical benefits, the Guidebook states that "[a]fter retirement, the Company will continue your health care program at no cost to you," and that coverage "remains the same as when [the retiree was] actively working." The Guidebook also describes the cap placed on maximum lifetime coverage under the major medical plan. With respect to life insurance benefits, the Guidebook states that protection is provided "during your working years and during retirement", with premiums "paid for by your Company". Benefits are reduced after retirement to $5,000 as the "final death benefit."
The "reservation of rights" clause, which is printed on the inside back cover of the Guidebook following several blank pages and is typed in smaller print than the remainder of the booklet, states that "[m]any of the plans and benefits described herein [but nowhere specified, listed or cross referenced], being completely voluntary on the part of the Company, are subject to modification or termination [upon circumstances or occurrences nowhere described] at the considered discretion of the Board of Directors." (Emphasis added.) No right to terminate is anywhere expressly referenced in conjunction with the medical, health or life insurance benefits described in the body of the Guidebook, which are at issue in this case. The employees and we, as a Court, are left to speculate which of the "many" plans and benefits described in the Guidebook are terminable. The ambiguity is self-evident.
It is not without significance, though hardly determinative, that the reservation of rights clause does not measure up to ERISA's uniform technical disclosure requirements (29 USC § 1022 [b]; 29 CFR 2520.102-2 [b]). Although some of the specific regulatory requirements first became effective in 1977, years after CMIC first printed its Guidebook and adopted the benefit plans at issue here, CMIC was required to bring its summary plan description into compliance with ERISA's requirements by that date at the latest. CMIC is in a better position to deal with and suffer for its use of the small print device and for its failure to measure up than the retirees, who have clearly been prejudiced by the liquidator's judicially authorized unilateral withdrawal of benefits.
*149 Also, the ambiguity in the reservation of rights clause is not eliminated by reference to relevant insurance certificates or master insurance plans. Although CMIC's Blue Cross/Blue Shield policy contained a termination provision, by its terms it governed only the relationship between CMIC, as the contract holder, and the insurer  not the relationship between CMIC and its retirees. It appears also that the Employee Medical Reimbursement Plan, referenced by the dissent, was neither filed with the Secretary of Labor as required by ERISA (29 USC § 1021 [b]) nor admitted into evidence by the Referee. Finally, the termination language in the group life insurance policy and certificate adds more confusion than light to the resolution of the central issue. As the dissent notes, both the policy and the certificate provide that the insurance terminates "when the Individual ceases to be a member of a class of Individuals eligible for insurance." Yet retirees as a class are clearly "eligible for insurance" under the plan, and there is no showing in this case that any of the claimant-retirees "ceased to be a member" of that class. Moreover, the policy and certificate also state, somewhat incongruously, that the insurance terminates "upon termination of employment"  which it clearly did not as to the class of retirees in this case who, in fact, received insurance benefits upon retirement and until the liquidator's decision to withdraw.
The dissent relies heavily on cases in which an employer expressly and unambiguously reserved the right to terminate benefits. Mere language that benefits "will continue" into retirement in the face of an unambiguous reservation of right, of course, is not sufficient to establish mutual intent and understanding that benefits vest at retirement and continue "as when [the retiree was] actively working". This, however, despite the repetitive accusation of impropriety at our method of analysis, is not such a case.
The dissent also points to language in the Guidebook describing the life insurance conversion privilege, which kicks in "upon termination of the Insurance Plan by the Company." However, a preceding paragraph states that "[i]f an employee leaves the employ of the Company for any reason other than retirement, the insurance provided by the Company will be cancelled" (emphasis added), seemingly restricting use of the conversion privilege to nonretirees. That reasonable, intelligent and differing minds must resort to microscopic and selective examination of the documents, which the company *150 was in the best position to write clearly and unambiguously in the first place, tellingly rebuts the certainty of the dissent. The termination clause, central to the Appellate Division's and the dissent's view of this case and its documents, is unclear and ambiguous.
Inasmuch as the Employee Guidebook and other plan documents, when read together, do not supply an unambiguous answer to the "simple [issue] of contract interpretation"  whether CMIC intended to provide nonterminable life, health and medical benefits to its retired employees  resort to extrinsic evidence is appropriate and necessary (Smith v ABS Indus., 890 F.2d 841 [6th Cir]; Moore v Metropolitan Life Ins. Co., 856 F.2d 488, supra). The retirees submitted a variety of letters and memoranda from CMIC to them, some of which stated that upon retirement the retiree would remain covered and that life and health insurance benefits would be available "for the rest of [the retiree's] life," that the retirees were "100% vested," and that the benefit "amount will remain unchanged for the rest of your life." These unequivocal representations, which the dissent ironically finds ambiguous, are allowable because of the threshold ambiguity, and they satisfy the retirees' unaltered burden of proving that CMIC intended to provide them with nonterminable benefits.
In sum, the Superintendent's obligations with respect to this controversy are measured by the particular contractual arrangement between CMIC and its retirees and the retirees' evidentiary submissions. Tested by those factors, there is an insufficient basis to conclude that the liquidator-Superintendent had authority to terminate the retired employees' contractually nonterminable benefits.
Finally, if there would be any "evisceration" of anything in this case, it would be of the proven protections of these retired employees by sustaining the liquidator's actions. We have applied correct, fair and principled analysis and law to protect the retirees from that evisceration.
We have considered the other arguments of the parties and conclude they are without merit or do not affect the result and narrow rationale in this case.
Accordingly, the order of the Appellate Division should be reversed, with costs, and claimants-appellants' cross motion to reject the Referee's report granted.
SIMONS, J. (dissenting).
I would affirm.
The health and life insurance benefits at issue here are *151 nonfunded "welfare benefit plans" which are not protected by ERISA's automatic vesting requirements (see, 29 USC § 1002 [1]; § 1051 [1]). The issue, therefore, is a simple one of contract interpretation. Claimants, 165 former employees claiming entitlement to such benefits, must prove that the employer intended the welfare benefits to vest upon retirement (see, Howe v Varity Corp., 896 F.2d 1107, 1109 [8th Cir]; Anderson v Alpha Portland Indus., 836 F.2d 1512, 1517 [8th Cir]). To meet this burden, they must produce written evidence of an employer's intent to be bound (see, Ryan v Chromalloy Am. Corp., 877 F.2d 598, 603 [7th Cir]; Musto v American Gen. Corp., 861 F.2d 897, 900-901 [6th Cir]; Moore v Metropolitan Life Ins. Co., 856 F.2d 488, 492 [2d Cir]; Anderson v Alpha Portland Indus., 836 F.2d 1512, 1517 [8th Cir], supra). The language of the contract controls and under familiar contract principles the Court may not go outside the plan or the plan documents unless the language is ambiguous.
The majority, in finding for claimants, concludes that the documents are ambiguous. I disagree with its holding because in interpreting the contract, (1) it has misapplied the law by failing to consider provisions in the summary plan description (SPD) and plan documents which clearly reserve CMIC's right to terminate the plans at issue; (2) it has resorted to the use of extrinsic evidence when no ambiguity as to the right to terminate exists in those documents; (3) it has shifted the burden of proof and rather than requiring claimants to prove a vested right to these benefits has required the employer to prove nonvesting; and (4) it has refused to credit a reservation of rights clause in the Guidebook, and in doing so has imposed a legal standard on the employer that did not exist at the time the benefit plans were adopted and the Guidebook was printed by CMIC.

I
ERISA requires that every employee benefit plan be established and maintained pursuant to a written instrument and that a SPD of that benefit plan be provided to participants and beneficiaries (29 USC § 1102 [a] [1]; § 1022 [a]). These are the documents which the court considers in determining whether an employer has reserved its right to terminate or amend a welfare benefit plan (see, Ryan v Chromalloy Am. Corp., 877 F.2d 598, 603, supra; Musto v American Gen. Corp., 861 F.2d 897, 900-904, supra; Moore v Metropolitan Life Ins. Co., 856 F.2d 488, 492, supra).
*152 Thus, the starting point for determining the claimants' rights is the Employee Guidebook, which is the SPD required under ERISA (29 USC § 1022), and other relevant plan documents, i.e., the Group Life Insurance policy, the Certificate of Group Life Insurance, the Blue Cross/Blue Shield policy, and the CMIC Employee Medical Reimbursement Plan. None of these documents contain language indicating that CMIC intended the welfare benefits to vest at retirement. On the contrary, they expressly reserve CMIC's right to amend or terminate the plans at issue.
The Guidebook contains an explicit reservation of rights clause which states that the plans and benefits are completely voluntary "on the part of the Company" and are subject to "modification or termination" at management discretion.[1] The reservation is confirmed by other provisions in the Guidebook and plan documents. In referring to the medical benefits, for example, the Guidebook states not only the language quoted by the majority, but also that "[t]he Basic Blue Cross  Blue Shield coverage remains the same as when you were actively working," i.e., CMIC promised to provide its retirees with continued medical benefits to the same extent that those benefits would be available if the retiree was still an active employee. If the benefits were not available to employees, they would not be available to retirees. Similarly, the Employee Medical Reimbursement Plan states that: "The benefits described herein, being completely voluntary on the part of the Company, are subject to modification or termination at the considered discretion of the Board of Directors."[2] Moreover, the Blue Cross/Blue Shield policy expressly provides for termination *153 of the medical benefits contract by CMIC upon 15 days' notice from the anniversary of the effective date.
The Guidebook and plan documents also contain language relating to the life insurance benefits which indicate CMIC did not intend those benefits to vest. While the majority refers to a statement in the Guidebook that the life insurance is provided "`during your working years and during retirement'" with premiums paid by the company (majority opn, at 148), it fails to recognize reservation of rights language on the same page under the heading of "Conversion Privilege", which states in part that "[a]s set forth in your insurance certificate you may, upon termination of employment or termination of the Insurance Plan by the Company, convert your insurance under the Plan to an individual policy" (emphasis added). Immediately following this language is another paragraph titled "Master Policy to Govern" which states that the controlling contract is the Group Insurance Plan and not the Employee Guidebook. Significantly, the Group Life Insurance policy and the individual certificates, both available to claimants, expressly provide that CMIC retained the power to terminate the policy for any class of individuals previously covered.
In the face of all these statements, it is difficult to comprehend how the company could more clearly and unambiguously reserve its right to terminate these benefits or how claimants can be said to have satisfied their burden of proving that the company intended the benefits to vest on retirement (see, Howe v Varity Corp., supra; Anderson v Alpha Portland Indus., supra).
Nevertheless, the majority contends that various phrases from the SPD and plan documents support vesting. These phrases (see, majority opn, at 148), when considered in the context, establish that the company intended benefits to continue after retirement, but they do not establish that the company intended them to vest at retirement so that management could not later modify or terminate them if the company's finances required it. The contention that such phrases establish vesting has been rejected repeatedly by the courts (see, e.g., Howe v Varity Corp., supra, at 1109-1110 [summary plan documents stating that welfare benefits "continue in retirement" and plan documents securing employee's right to claim benefits to which employee "shall have become entitled" prior to termination of plan did not establish retirement as a *154 vesting point]; Anderson v Alpha Portland Indus., supra, at 1518-1519 [collective bargaining agreement stating that benefits provided "until death of retiree" and SPD stating that "coverage will continue for the remainder of your life" did not constitute vesting]; DeGeare v Alpha Portland Indus., 837 F.2d 812, 814, 816-817 [promise that future retirees' benefits "will continue" not a promise of vesting]; Moore v Metropolitan Life Ins. Co., supra, at 490 [benefits described as being for employees "lifetime" at "no cost" did not equal vesting]).

II
The majority believing that the SPD and the plan documents are ambiguous has improperly resorted to the use of extrinsic evidence, such as informal letters and memos. Ironically, if ambiguity is to be found, it is to be found in this extrinsic evidence. It is not clear, for example, whether statements contained in the extrinsic evidence that benefits were "100% vested" referred to health and welfare benefits or employee pension benefits which did vest at retirement. In any event, the use of such evidence is improper. Extrinsic evidence can be considered only when the ambiguity appears on the face of the instruments (Howe v Varity Corp., 896 F.2d 1107, 1110, supra; Ryan v Chromalloy Am. Corp., 877 F.2d 598, 602, supra; Anderson v Alpha Portland Indus., 836 F.2d 1512, supra).
Aside from general contract concerns prohibiting extrinsic evidence, there is an important policy reason for the court's reluctance to recognize extrinsic evidence to support a claim of vesting for welfare benefits or to infer vesting. As the court stated in Moore v Metropolitan Life Ins. Co. (856 F.2d 488, 492, supra): "Congress intended that plan documents and the SPDs exclusively govern an employer's obligations under ERISA plans. This intention was based on a sound rationale. Were all communications between an employer and plan beneficiaries to be considered along with the SPDs as establishing the terms of a welfare plan, the plan documents and the SPDs would establish merely a floor for an employer's future obligations. Predictability as to the extent of future obligations would be lost, and, consequently, substantial disincentives for even offering such plans would be created." (See also, Anderson v Alpha Portland Indus., 836 F.2d 1512, 1517; Nachwalter v Christie, 805 F.2d 956, 960 [11th Cir]).
Reliance on extrinsic evidence to hold for claimants not *155 only "fl[ies] in the face of ERISA's plain language" (856 F2d, at 492), but could, as the Moore court noted, decrease protection for future employees and retirees by eviscerating the predictability of future obligations, thus creating substantial disincentives for even offering the welfare benefits in the first place.

III
It is the claimants who must establish vesting. By rejecting the clear language of the SPD and the plan documents, the majority has not only violated established rules of construction in this important area, but it has improperly shifted the burden of proof to the respondent to rebut the significance of isolated phrases in the Guidebook and plan documents when they manifestly contain statements reserving the company's rights.
There are sound reasons why the burden must remain on claimants. Congress exempted welfare benefits from the automatic vesting requirements and opted for a more flexible approach "because the cost of such plans are subject to fluctuating and unpredictable variables" (Moore v Metropolitan Life Ins. Co., 856 F.2d 488, 492, supra). Thus, committees of both the House and Senate noted, in explaining why welfare benefits were not considered "accrued benefits" under ERISA, that "`[t]o require the vesting of these ancillary benefits would seriously complicate the administration and increase the cost of [pension] plans whose primary function is to provide retirement income'" (Moore v Metropolitan Life Ins. Co., supra, at 491 [quoting HR Rep No. 93-807, 93d Cong, 2d Sess, reprinted in 1974 US Code Cong & Admin News 4639, 4670, 4726; S Rep No. 93-383, 93d Cong, 2d Sess, reprinted in 1974 US Code Cong & Admin News 4639, 4890, 4935). The rationale is particularly persuasive in this case. The 165 claimants in this case did not contribute funds to purchase the benefits they now seek. They are nonfunded. Thus, any award claimants receive must be paid out of the assets of an insolvent insurance company, assets needed to honor the claims of insureds and injured third parties.

IV
Finally, the majority rely on the fact that the Guidebook does not meet ERISA's disclosure standards. The benefit plan *156 was adopted by CMIC and the Guidebook printed in 1964, 10 years before ERISA was adopted and 13 years before many of its technical disclosure standards became effective standards. Indeed, most of the claimants retired prior to the effective date of these disclosure provisions and can hardly claim the benefits vested at retirement because of any failure to meet ERISA standards at that time. Thus, the majority's conclusion that the reservation clause in the Guidebook is not entitled to weight because it does not meet ERISA's technical disclosure standards, is to impose a legal standard on the employer that did not exist at the time the alleged wrong occurred. But even if defects in the Guidebook are to be considered, the burden rested on claimants to establish "`significant reliance on, or possible prejudice flowing from the summary'" (Anderson v Alpha Portland Indus., 836 F.2d 1512, 1520, supra; see generally, Bachelder v Communications Satellite Corp., 837 F.2d 519, 523 [1st Cir]). They have failed to do so.

V
In sum, I conclude that claimants have not only failed to carry their burden of proof but that the evidence establishes that the benefits did not vest. Because the majority's determination relies on evidence which legally should not control under settled principles of law, I dissent.
Accordingly, I would affirm the order of the Appellate Division.
Order reversed, etc.
NOTES
[1] "Many of the plans and benefits described herein, being completely voluntary on the part of the Company, are subject to modification or termination at the considered discretion of the Board of Directors.

"The Company, naturally, hopes and expects to continue these plans and benefits indefinitely. In the event of termination of any of the pension plans, any conversion right or benefit vested in the employees will be, of course, paid to the participants as their interests require, pursuant to the trust agreements" (emphasis added).
[2] The majority claim that the plan was neither filed with ERISA nor distributed to the retirees. Claimants do not allege the plan was not filed, however, and ERISA does not require that the master plan documents or policies be distributed to employees who have not asked for them (see, e.g., Musto v American Gen. Corp., 861 F.2d 897). Additionally, there is evidence in the record that the plan documents were made available to plaintiffs upon their request. The relevant language from these plan documents was provided in the stipulated facts and thus was properly considered by the courts as evidence of CMIC's nontermination intent.