38 F.3d 660
 IN TIME PRODUCTS, LTD., Plaintiff-Appellee-Cross-Appellant,
v.
TOY BIZ, INC. & Avi Arad & Associates,
Defendants-Counterclaim-Plaintiffs-Appellants-
Cross-Appellees,
v.
CHARLES JUD SALES, INC., Charles Jud & Nancy Jud,
Counterclaim-Defendants-Appellees Cross-Appellants.
 Nos. 2094, 1893, Dockets 94-7198, 94-7236.
 United States Court of Appeals,
Second Circuit.
 Argued June 28, 1994.
Decided Oct. 24, 1994.
 
 Martin B. Pavane, New York City (Robert M. Haroun, Michael C. Stuart, Cohen, Pontani, Lieberman & Pavane, on the brief), for plaintiff-appellee-cross-appellant-counterclaim-defendants-appellees.
 Joseph H. Lessem, New York City (Louis S. Ederer, Cowan, Liebowitz & Latman, on the brief), for defendants-counterclaim-plaintiffs-appellants-cross-appellees.
 Before: KEARSE and ALTIMARI, Circuit Judges, and SEYBERT, District Judge*.
 KEARSE, Circuit Judge:
 
 
 1
 Defendants-counterclaimants Toy Biz, Inc., et al. (collectively "Toy Biz"), appeal from a final judgment entered in the United States District Court for the Southern District of New York following a bench trial before Robert P. Patterson, Jr., Judge, awarding plaintiff In Time Products, Ltd. ("In Time"), $138,876.47 in damages and $124,111.39 in attorneys' fees, plus prejudgment interest, on In Time's claim for breach of a settlement agreement requiring Toy Biz to, inter alia, purchase certain products from In Time. On appeal, Toy Biz argues principally (1) that the district court erred in rejecting its argument that it was excused from purchasing those products because they did not meet the proper standard of quality, and (2) that the award of $124,111.39 in attorneys' fees was excessive. In Time cross-appeals from so much of the judgment as did not award it higher attorneys' fees. For the reasons stated below, we affirm the district court's decision on the merits of the contract claim, but we conclude that the fee award was excessive.
 
 I. BACKGROUND
 
 2
 The present controversy grows out of the settlement of a copyright and trade-dress infringement dispute between rival makers of robot toys. The relevant events, largely as found by the district court, were as follows.
 
 
 3
 A. The Settlement of the Initial Controversy
 
 
 4
 In January 1991, Toy Biz introduced into the United States toy market its small male child robot called "My Pal 2," which was designed to talk and to perform several play functions such as throwing a small ball. Its retail price ranged from $50 to $70, and its wholesale price ranged from $35 to $37. In January 1992, In Time introduced its "Rollin Robbie" robot which, though less sophisticated, performed similar functions. The Rollin Robbie sold for a fraction of the price of My Pal 2, at $25 to $30 retail and approximately $13.90 wholesale.
 
 
 5
 In August 1992, in the face of copyright and trade-dress infringement claims from Toy Biz, In Time commenced an action in the district court seeking declaratory and injunctive relief. In October, after the court had denied cross-motions for preliminary injunctions, the parties entered into a settlement agreement (the "Agreement"), pursuant to which In Time agreed to cease the manufacture and sale of Rollin Robbie or any product having a substantially similar appearance and to assign to Toy Biz all rights in the creation and design of Rollin Robbie. Toy Biz agreed to purchase 17,500-17,700 Rollin Robbies from In Time at $10.35 per unit, provided they were delivered to Toy Biz no later than October 31, 1992. Toy Biz agreed to pay for these units by hand-delivered check within 24 hours of their receipt. The Agreement provided that In Time could also sell up to 20,200 Rollin Robbie units to others through November 30, 1992, retaining 57.5% of the profits and remitting the remaining 42.5% to Toy Biz. No later than December 1, 1992, In Time was required to destroy any remaining inventory. Upon the elimination of In Time's Rollin Robbie inventory in accordance with these steps, Toy Biz was to pay In Time $150,000 out of an escrow account funded by Toy Biz.
 
 
 6
 The Agreement required that the units In Time sold to Toy Biz be "in good working condition" and required that In Time repair or reimburse Toy Biz for any defective units. (Agreement p 3(c).) It further provided that
 
 
 7
 In Time shall use its best efforts to ensure that all units of Unsold Inventory hereinafter sold and delivered by In Time shall be of the same or higher quality as [sic ] any Rollin Robbie product sold and delivered by In Time to date. In Time covenants that the materials and components used in the manufacture of such Unsold Inventory shall be of at least the same quality as the materials and components used in Rollin Robbie product sold and delivered to date.
 
 
 8
 (Agreement Sec. 3(e)).
 
 
 9
 The Agreement also stated that it constituted the "complete and total Agreement of the parties with respect to its subject matter, incorporating all representations, warranties and/or statements upon which they will rely and merging all prior discussions and negotiations between them," and that "[a]ny changes or modifications to this Agreement must be in writing and signed by both parties." (Agreement Sec. 8(A).) The Agreement stated that it was to be interpreted under New York law (id. Sec. 8(B)), and that in any suit alleging breach of the Agreement the prevailing party would be entitled to reasonable attorneys' fees (id.).
 
 
 10
 The Agreement provided that "[f]inished" Rollin Robbie units were "to be inspected at [In Time's] China factory before final packing and shipment to Hong Kong pursuant to statistical inspection procedure to be agreed upon by parties." (Agreement p 3(c)(1).) On October 12, 1992, shortly after signing the Agreement, the parties met in Hong Kong, along with their local agents and a representative of a toy testing company, to discuss inspection. Toy Biz president Louis Schwartz brought with him a copy of the My Pal 2 quality specifications check list, and during the 15-30 minute meeting he referred to various tests on that check list and made written notes on it with regard to differences between My Pal 2's functions and Rollin Robbie's functions. At the end of the meeting, Schwartz made copies of his marked-up list and distributed them to the meeting participants; after the meeting, he faxed another copy of the marked-up list to In Time, with a note stating, in pertinent part, "[y]ou now have a copy of the Q.C. specifications we agreed to." In Time did not respond.
 
 
 11
 One of the written specifications for My Pal 2 required that the toy be tested by being dropped four times from a height of three feet (the "drop test"). This test had two purposes: (1) to determine whether the dropped toy had any broken or sharp edges ("drop safety test"), and (2) to determine whether it could continue to perform its play functions ("drop function test"). On October 22, 1992, In Time was notified that Toy Biz would not purchase Rollin Robbie units from In Time because they did not meet My Pal 2's drop function test.
 
 
 12
 On October 29, 1992, Toy Biz offered to buy the Rollin Robbie units; but instead of paying for them within 24 hours as provided by the Agreement, Toy Biz sought to hold 50% of the purchase price in escrow for approximately five months. On January 5, 1993, Toy Biz made a similar offer that would have allowed it to hold approximately 27% of the purchase price in escrow. In Time rejected both offers.
 
 
 13
 B. Suit To Enforce the Settlement Agreement; the Decisions Below
 
 
 14
 In Time revived its lawsuit, contending that Toy Biz had breached the settlement agreement by refusing to take delivery of the Rollin Robbie units Toy Biz had agreed to purchase. In Time moved in the district court for enforcement of the Agreement and an award of attorneys' fees. Toy Biz counterclaimed, contending that In Time had breached the Agreement by failing to destroy In Time's inventory of Rollin Robbie toys remaining on December 1, 1992. Toy Biz sought attorneys' fees in connection with its counterclaims and its defense of In Time's claims. Depositions were conducted, and the court held a three-day bench trial.
 
 
 15
 In Time contended that the only quality requirement imposed by the Agreement was that In Time use its best efforts to ensure that the units to be purchased by Toy Biz be in good working condition and not inferior to the Rollin Robbie products sold by In Time theretofore. Toy Biz took the position that In Time had agreed, even prior to the October 12 meeting, that the Rollin Robbie units must meet the My Pal 2 specifications with respect to the drop function test. At his deposition, Schwartz testified that
 
 
 16
 We basically agreed to this whole thing beforehand. The only thing that went on in that meeting that had to be agreed to were what were the functions of Rollin Robbie because what we had agreed to in the beginning that we were going to test Rollin Robbie to My Pal 2 specification.
 
 
 17
 (Dep. 134.) At trial, Schwartz acknowledged having made this statement, and he testified that in a telephone conversation with In Time principal Nancy Jud prior to the October 12 meeting "[a]n agreement had been reached to utilize the My Pal 2 specification to do this inspection and to modify when necessary." (Tr. 355.) He later added that he had perhaps "been a bit imprecise by saying that in that phone call we agreed to the specific, exact content of what was in the document. What we agreed to--what my belief was that we agreed to was [sic ] to use that document as the basis for the inspection." (Id. 357.)
 
 
 18
 Nancy Jud, who attended the October 12 meeting in Hong Kong and was the only In Time principal who had spoken with Schwartz on the subject of that meeting prior to its occurrence, testified, inter alia, that although Schwartz had indicated prior to the settlement agreement that the Rollin Robbie units would be tested in accordance with the My Pal 2 specifications, she had not seen the My Pal 2 specifications and had believed the test specifications for the two toys were the same. She testified that it was not her understanding that the purpose of the October 12 meeting was to establish qualitative standards for the testing of Rollin Robbie that were any different from the standards In Time had previously used for that toy. She stated that her understanding was that the purpose of the meeting was solely to discuss procedures.
 
 
 19
 In Time principal Charles Jud, who also had attended the October 12 meeting, testified that his understanding was that the settlement agreement required only that the Rollin Robbie units to be purchased by Toy Biz meet the quality standards of the units shipped to In Time's customers previously. Charles Jud had not seen the My Pal 2 specifications prior to the end of the October 12 meeting, and his understanding was that the purpose of that meeting was to establish procedures for checking the safety, aesthetics, and packaging of the Rollin Robbie units. He testified that the topic discussed at length at the October 12 meeting was the respective percentages of test failures that would be regarded as acceptable with regard to safety, features, and aesthetics. Other matters were discussed only superficially. He stated that although safety tests were mentioned, the drop function test was not.
 
 
 20
 Schwartz acknowledged that the In Time principals had not seen the My Pal 2 specifications when the pre-October 12 meeting conversation he described took place. He also acknowledged that at the October 12 meeting he was the only person present who had a copy of those specifications. Schwartz testified that toy manufacturers consider their quality control specifications to be confidential and that the first time anyone from In Time had a copy of Toy Biz's specifications for My Pal 2 was at the conclusion of the October 12 meeting when he distributed copies to those in attendance. He testified that In Time's principals had agreed to the use of the My Pal 2 specifications before they actually had any opportunity to see those specifications.
 
 
 21
 The Juds testified that they did not agree, either at or prior to the October 12 meeting, to the use of the drop function test part of the My Pal 2 specifications. Other than Schwartz, all five of the participants in the October 12 meeting, including Toy Biz's own Hong Kong agent, testified that they did not recall any discussion of the drop function test. And although Schwartz testified that a statement that after the drop test the toy "has to work" is something he "would" normally say at such a meeting, he testified that he could not "swear" that he had actually said it. (Dep. at 106-07.)
 
 
 22
 Following the trial, the district court ruled in favor of In Time. In an Opinion and Order dated July 9, 1993 ("July Opinion"), 1993 WL 267277, the court noted that the only quality standard mentioned in the Agreement "required only that the Rollin Robbie units be of the same quality as that of units previously delivered to In Time customers." July Opinion at 8. Generally finding the testimony of the Juds credible and that of Schwartz not credible, the court found it improbable, given the relative costs of the two toys, that In Time would have agreed to meet the quality standards for the far more expensive toy, especially without even seeing the latter's specifications. Further finding that the function aspect of the My Pal 2 drop test had not been mentioned at the October 12 meeting, the court concluded that there had been no "meeting of the minds" at that meeting to include that aspect as part of the quality standard that the Rollin Robbie units would have to meet. Id. at 10-11.
 
 
 23
 The court also held that to the extent Toy Biz contended that the October 12 meeting or its telephonic antecedents amounted to a modification of the Agreement, those events were ineffective to constitute a modification of the Agreement (a) because
 
 
 24
 "a written agreement that expressly states it can be modified only in writing cannot be modified orally," Towers Charter & Marine Corp. v. Cadillac Insurance Co., 894 F.2d 516, 522 (2d Cir.1990); N.Y.Gen.Oblig.Law Sec. 15-301(1) (McKinney 1989),
 
 
 25
 July Opinion at 8, and (b) because though there are two exceptions to that principle, see Towers Charter & Marine Corp. v. Cadillac Insurance Co., 894 F.2d at 522 (part performance of or reliance on the modified agreement by means of conduct that is unequivocally referable to the oral modification and inconsistent with the agreement as written), neither exception was proven in the present case.
 
 
 26
 The district court concluded that the Agreement required In Time only to use its best efforts to provide Toy Biz with Rollin Robbie units that were of the same quality as units theretofore delivered to prior In Time customers; that there had been no modification of the Agreement; that In Time had not breached the Agreement; and that Toy Biz had breached the Agreement.
 
 
 27
 In an August 6, 1993 ruling from the bench ("August Ruling"), the court also found that Toy Biz had not carried its burden of showing that In Time had failed to mitigate damages. Noting that a party is not required to mitigate damages by accepting a compromise offer if in so doing the offeree would be required to surrender a material contract right, see Levantino v. Insurance Company of North America, 102 Misc.2d 77, 87, 422 N.Y.S.2d 995, 1002 (Sup.Ct.1979) (citing Restatement of Torts Sec. 918, comment j ), the court concluded that In Time was not required to accept Toy Biz's compromise offers because acceptance would have deprived In Time of its contractual right to immediate payment in full. (August Ruling at 5-6). The court also credited Charles Jud's testimony as to In Time's efforts to sell the rejected units to other buyers and found that those efforts to avoid damages were sufficient.
 
 
 28
 Thereafter, as discussed in Part II.B. below, the court granted In Time attorneys' fees in connection with the enforcement of the Agreement. Judgment was entered requiring Toy Biz to pay In Time $138,876.47 in damages and $124,111.39 in attorneys' fees, plus prejudgment interest on both awards.
 
 II. DISCUSSION
 
 29
 On appeal, Toy Biz contends principally that the district court's construction of the Agreement and its findings of fact are clearly erroneous, that the court misconstrued Toy Biz's arguments, and that the attorneys' fees award is excessive. In Time has cross-appealed, seeking a higher award of fees. We see no error in the district court's rulings as to the merits of the contract controversy, but we conclude that its award of attorneys' fees was excessive.
 
 A. Breach of Contract
 
 30
 When the district court as factfinder is confronted with a contract provision that is not unambiguous, it may properly consider evidence extrinsic to the contract itself, including testimony offered by the parties. See, e.g., In re Consolidated Mutual Insurance Co., 77 N.Y.2d 144, 150, 565 N.Y.S.2d 434, 436, 566 N.E.2d 633, 635 (1990). The court's findings as to the meaning of such a provision are findings of fact that may not be disturbed unless they are clearly erroneous. See, e.g., Marine Transport Lines, Inc. v. International Organization of Masters, 878 F.2d 41, 44-45 (2d Cir.1989), cert. denied, 493 U.S. 1022, 110 S.Ct. 724, 107 L.Ed.2d 743 (1990); Network Publishing Corp. v. Shapiro, 895 F.2d 97, 99 (2d Cir.1990).
 
 
 31
 The fact that there may have been evidence to support an inference contrary to that drawn by the trier of fact does not mean that the court's finding is clearly erroneous. See Healey v. Chelsea Resources, Ltd., 947 F.2d 611, 618 (2d Cir.1991). The determination as to which of competing inferences to draw lies within the province of the trier of fact, and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," Anderson v. Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); see United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 179-80, 94 L.Ed. 150 (1949). Likewise, assessments of witness credibility are peculiarly within the province of the trier of fact, and "[w]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." Anderson v. Bessemer City, 470 U.S. at 575, 105 S.Ct. at 1512.
 
 
 32
 We see no clear error in the district court's findings of fact as to the agreements reached by the parties in this case. Though the "or higher" phrase in the Agreement's provision that In Time would provide Toy Biz with Rollin Robbie units "of the same or higher quality as [sic ] any Rollin Robbie product sold and delivered by In Time to date" (Agreement Sec. 3(e) (emphasis added)) created some ambiguity as to In Time's obligation, the court's finding that In Time had not agreed to be bound by the drop function test part of the My Pal 2 specifications is amply supported by the record. The evidence included the testimony of Nancy Jud that she had not believed the tests to which Schwartz adverted prior to the October 12 meeting were more onerous than the tests the Rollin Robbie had already passed; the apparently unanimous testimony that prior to the end of the October 12 meeting no In Time principal saw or had read to them the details or headings of the My Pal 2 specifications; the equivocation by Schwartz as to whether he even mentioned the function aspect of the drop test at that meeting; and the testimony by all participants in the meeting other than Schwartz that in fact the function aspect of the drop test was not discussed. Further, the court was entitled to find that the Juds' version of the parties' agreement was more likely the true version since the court inferred that In Time was unlikely to have agreed that its toy must meet the quality standards of the more expensive My Pal 2. Nancy Jud's testimony that she had viewed the purpose of the October 12 meeting to be simply the establishment of procedures, rather than of substantive quality standards, was entirely consistent with the Agreement itself, which stated that the parties would agree upon a "statistical inspection procedure" (Agreement Sec. 3(c)(1)). In sum, we conclude that there is no basis for overturning the district court's findings that In Time was not contractually required to meet quality standards higher than those the Rollin Robbie had previously met.
 
 
 33
 Toy Biz contends that it is entitled to a reversal because the district judge misconstrued its arguments. For example, quoting a portion of the district court's July Opinion which stated that "Schwartz ... testified that [In Time] was aware at the time of entering into the Settlement Agreement that the specifications for My Pal 2 had to be met," Opinion at 7, and noting that the court found that testimony, in all the circumstances, to be not credible, see id., Toy Biz contends that the court misstated Toy Biz's factual and legal position. We reject this contention. As described in Part I.B. above, the record reflects that Schwartz indeed testified at his deposition that "we had agreed ... in the beginning[ ] that we were going to test Rollin Robbie to My Pal 2 specification," and testified at trial that "my belief was that we agreed to ... use that document as the basis for the inspection." We find no mischaracterization of Schwartz's testimony in the district court's opinion. Though Schwartz sought from time to time to retreat from his own prior statements, the court noted that his "testimony [was] affected by his post-hoc rationalization of events in a manner most favorable to his company." July Opinion at 8 n. 5. We find no error in this conclusion.
 
 
 34
 Toy Biz also contends that the district court misconstrued Toy Biz's invocation of the October 12 meeting as an argument that the discussions at that meeting resulted in a modification of the written settlement agreement, whereas Toy Biz's actual argument was that that meeting was intended not to modify the Agreement but to fill in gaps left by that document as to " 'a statistical quality control procedure.' " (Toy Biz brief on appeal at 32 (quoting testimony of Schwartz (Tr. 392)).) Hence, Toy Biz argues that it needed no written assent from In Time to the fax asserting that the Rollin Robbie units would have to meet My Pal 2 specifications. We conclude that the district court did not misconstrue Toy Biz's position and that Toy Biz has misconstrued the district court's ruling. The district court found that in the Agreement, the parties agreed that the quality standard to be met by In Time for the Rollin Robbie units to be sold to Toy Biz was that those units were to be of no lower quality than units theretofore delivered to prior In Time customers. In light of this finding, which was not clearly erroneous given the language of the Agreement, the disparity between the two toys' prices, and the testimony that the court found credible, the discussions at the October 12 meeting would have been material with respect to substantive quality standards, as contrasted with testing procedures, only if the discussions had ripened into a written agreement to modify the quality standard set in the Agreement. As the district court found "[i]n any event," there was no such writing, and there was no conduct sufficient to excuse the absence of such a writing. July Opinion at 11. We find no error.
 
 B. Attorneys' Fees
 
 35
 Toy Biz contends that the $124,111.39 awarded to In Time as attorneys' fees exceeded the amount that was reasonable and that the district court thus erred in making that award. In Time contends in its cross-appeal that the amount awarded was too low. We agree with Toy Biz.
 
 
 36
 In Time claimed in the district court that it had been billed a total of $198,834.26 in fees for which it was entitled to reimbursement pursuant to Sec. 8(B) of the Agreement. The district court, in an Opinion and Order dated January 21, 1994 ("January 1994 Order"), found this figure inflated. Having reviewed the records submitted by In Time's attorneys, the court noted that In Time's documentation revealed inappropriate charges for numerous clerical matters and for unnecessary or duplicative legal research. The court stated that
 
 
 37
 [t]he opposing party should not be expected to pay for overstaffing and unnecessary work by attorneys. However, because of the manner in which the computerized records are kept, the Court is unable to determine from their examination an exact amount to deduct for such duplicative and unnecessary time charges. Accordingly, it has determined to resort to other evidence to reach a determination of plaintiff's reasonable fees.
 
 
 38
 January 1994 Order at 7.
 
 
 39
 The court noted that for the presettlement phase of the litigation, which included bringing the action, preparing for trial, conducting a trial, and negotiating the settlement agreement, In Time had paid fees totaling only $59,086. The court found the request for $198,834.26 for the post-settlement litigation to be "way out of proportion." Id. at 8. It stated that
 
 
 40
 [i]t is hard to conceive that In Time, had it been faced with the decision, would have authorized expenditures of $198,834.26 for legal fees and disbursements for a potential recovery of $138,876.97 and to protect itself from Toy Biz's claims totaling $88,746 which were safeguarded by the escrow fund of $150,000 in early December and reduced to $50,000 in late December. In all likelihood, faced with a decision to authorize such fees, plaintiff would not have agreed to more than $75,000 as a fair fee for the remaining services of its attorneys.
 
 
 41
 Id. at 8-9 (emphasis added). Further, finding that the total amount in controversy was approximately $310,000, the court found that the requested $198,934 was thus "far in excess" of even the fee that would have been yielded by a 1/3 contingency arrangement. Id. at 9. However, the court concluded as follows:
 
 
 42
 Based on the foregoing analysis, the Court finds that a fee exceeding 40% of the amount in controversy would be grossly disproportionate to the fee plaintiff would have expected to make [sic ] with its counsel for litigating the post-settlement dispute and, accordingly, awards 40% of the total amount in controversy as reasonable attorneys' fees under the circumstances herein. The Court awards plaintiff $124,111.39 for its attorneys' fees, together with court costs.
 
 
 43
 Id. We conclude that this award was excessive.
 
 
 44
 A district court's award of attorneys' fees pursuant to a contractual fee-shifting provision must be reasonably related to the fee arrangement that the prevailing party would have made with counsel absent a fee-shifting agreement. See Diamond D Enterprises USA, Inc. v. Steinsvaag, 979 F.2d 14, 20 (2d Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993); F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1264 (2d Cir.1987); Equitable Lumber Corp. v. IPA Land Development Corp., 38 N.Y.2d 516, 524, 381 N.Y.S.2d 459, 465, 344 N.E.2d 391, 397 (1976) (fee must be "reasonably related to the normal fee an attorney would charge" absent fee shifting arrangement); cf. Hensley v. Eckerhart, 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983) ("[h]ours that are not properly billed to one's client also are not properly billed to one's adversary"). A party is not entitled to reimbursement for fees that it would not have agreed to pay if it there had been no contractual provision for reimbursement.
 
 
 45
 While the above principles were correctly stated in the district court's decision, they were not applied. Though noting that an ordinary contingent-fee arrangement would call for a 1/3 fee, the court awarded 40%. Further, having observed that any fee amount exceeding 40% would be "grossly" disproportionate, the court failed to recognize that 40% itself must be at least somewhat disproportionate, if not grossly so. Finally, the court awarded In Time more than $124,000 notwithstanding its finding that had there been no fee-shifting provision In Time would not have authorized fees in excess of $75,000. We conclude that in light of the court's findings, which are not clearly erroneous, the $124,111.39 fee award was a departure from the principle that a contractual fee award should approximate the fee arrangement that would have been made absent the fee-shifting provision.
 
 
 46
 In Time, in support of its cross-appeal for even higher fees, argues that the district court ignored the $150,000 that In Time sought to have paid from the escrow fund. We think it plain that the court did not ignore the escrow fund, and we see no error in the court's finding that with respect to the entire postsettlement controversy In Time would have authorized no more than $75,000 in fees had there been no fee-shifting provision.
 
 
 47
 Accordingly, we remand for reduction of the attorneys' fees awarded to In Time to $75,000.
 
 CONCLUSION
 
 48
 We have considered all of the parties' arguments in support of their respective appeals and, except to the extent indicated above, have found them to be without merit. The judgment of the district court is reversed insofar as it awarded $124,111.39 in attorneys' fees, plus prejudgment interest on that sum, and in all other respects is affirmed. The matter is remanded for entry of a new judgment in which In Time is awarded $75,000 in attorneys' fees, with prejudgment interest calculated on that sum.
 
 
 
 *
 Honorable Joanna Seybert of the United States District Court for the Eastern District of New York, sitting by designation