**MOBIUS MANAGEMENT SYSTEMS, INC., Plaintiff.**

v.

**FOURTH DIMENSION SOFTWARE, INC., Defendant.**

No. 94 Civ. 0749 (LAP).

United States District Court, S.D. New York.

Nov. 30, 1994.

**1008**

Jeffrey S. Trachtman, Jonathan Wagner, Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, for plaintiff.

Miriam L. Siroky, Mauro L. Siroky, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PRESKA, District Judge.

Plaintiff, Mobius Management Systems, Inc. ("Mobius"), seeks damages and a permanent injunction against defendant, Fourth Dimension Software, Inc. ("Fourth Dimension"), for breach of contract, for violations of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and for common law unfair competition. After holding a bench trial on October 6 and 7, 1994, I find that Mobius is entitled to injunctive relief, damages in the amount of $63,026.40, the amount of reasonable attorney fees it expended on this matter, and the costs of this action.

### BACKGROUND

Both Mobius and Fourth Dimension market software products for customers that use IBM mainframe computers. After Mobius brought a Lanham Act claim against Fourth Dimension concerning a side-by-side comparison of the products distributed by Fourth Dimension, the parties entered into a settlement agreement that contained a list of representations that Fourth Dimension could not make about Mobius's software package. Mobius brought the instant action after Fourth Dimension sent a letter to a prospective Mobius customer that compared the Mobius product to the Fourth Dimension product. That letter stated that, because of various advantages that the Fourth Dimension had over the Mobius software, the customer would save money if it purchased the Fourth Dimension product instead. According to Mobius, that correspondence contained several statements that Fourth Dimension had promised not to make in the previous settlement. In addition, Mobius argues, those statements, as well as several others mentioned in the letter, were false and therefore violated § 43(a) of the Lanham Act.

The parties made cross motions for summary judgment. I denied those motions for two reasons: first, I found that the settlement agreement was ambiguous as to whether certain statements listed in the agreement categorically could not be repeated by Fourth Dimension; and second, explanation about the technical aspects of the subject matter was needed before the truth or falsity of the statements could be determined. A bench trial was held on October 6–7, 1994. After observing the witnesses who testified at trial and reviewing that testimony and the parties' submissions, I make the following findings of fact and conclusions of law.

### I. Findings of Fact

#### A. Background

Mobius and Fourth Dimension are both in the business of, among other things, developing and marketing computer software programs for MVS[1] system main frame computers. (Tr. 16 (Gross);[2] Tr. 120 (Hollander); Miller Dep. at 32; Complaint ¶¶ 1–2).

Mobius's flagship product, introduced in 1982 under the name "INFOPAC," is a report distribution system, a product that allows large organizations to process, store, and retrieve reports containing financial data and other information. It saves substantial paper and human resources by permitting reports to be viewed on-line or printed out in packets automatically collated for each recipient. (Tr. 13–14 (Gross)). After this product attained marketplace success, Mobius began using the name INFOPAC for nearly its whole line of products; its report distribution

---

1. "MVS" is an IBM-developed operating system used in main frame computers. (Tr. 121 (Hollander)).

2. Citations to "Tr. ___" indicate portions of the record of the bench trial held on October 6 and 7, 1994. The relevant witnesses are indicated in parentheses.

system was renamed INFOPAC–RDS. (Tr. 13, 15–16 (Gross)).

Fourth Dimension markets a report distribution product, called CONTROL–D, which is in direct competition with INFOPAC–RDS. (Tr. 21 (Gross)).

## B. The First Advertisement

In or about April, 1993, Mobius became aware that Fourth Dimension had provided a potential customer with a document entitled "REPORT DISTRIBUTION, A Quick Comparison." (Plaintiff's Exh. 2 (the "First Advertisement")). The First Advertisement contained a chart listing approximately 100 product functions or features, indicating CONTROL–D's purported superiority over INFOPAC with a series of "Y's" and "N's." The context of the document—focusing on report distribution—made clear that CONTROL–D was being compared with Mobius's competing product, INFOPAC–RDS. Many of the statements concerned the basic architecture of the products and went to features and functions critical to the operation of a report distribution product. (Tr. 21–23, 26 (Gross)).

Alleging that the First Advertisement contained more than 70 false statements, and having been unsuccessful in obtaining a retraction or apology, Mobius commenced a Lanham Act suit against Fourth Dimension in this Court in May 1993. The parties entered into a settlement agreement (the "Agreement") in June of 1993. Under the Agreement (Plaintiff's Exh. 3 at 2), Fourth Dimension promised, among other things, to destroy all copies of the First Advertisement and not to "disseminate, either orally or in writing" 65 statements about INFOPAC contained in the First Advertisement. The prohibited statements were listed in Appendix 2 to the Agreement (the "Appendix 2 Statements").

The only first-hand account of the negotiations leading to the settlement was provided by Mr. Gross. Although Fourth Dimension was represented in the negotiations by two attorneys and a staff member, Bob Weslosky, it only offered testimony as to the intent of the parties by its President, Yossie Hollander, who was not present at the negotiations and never spoke with anyone from Mobius about the terms of the settlement. (Tr. 155 (Hollander)). I credit Mr. Gross's account, both because of his personal knowledge of the events at issue and because I find his account to be credible.

Mr. Gross met with Mr. Weslosky and attorneys for both sides in on-and-off discussions over three days in early June 1993, during and after Mr. Gross's deposition in the prior action. Demonstrating INFOPAC–RDS on a computer screen and referring to the INFOPAC–RDS User's Manual, Mr. Gross explained to Fourth Dimension's representatives why each of the challenged Fourth Dimension claims about INFOPAC–RDS was false. The parties agreed, item by item, what to include in Appendix 2 only after agreeing that each such item was in fact false. Certain items were rephrased before being included, and others were omitted because Mr. Gross was unable to convince Fourth Dimension's representatives that they were false. (Tr. 28–42 (Gross)).

In particular, the parties discussed and agreed on the falsity of three items that came to be implicated in this action: Item 8 ("INFOPAC provides for pre-allocated VSAM datasets"); Item 9 ("INFOPAC does not provide for dynamic allocation of required space"); and Item 65 ("INFOPAC creates 2 VSAM datasets for every report version"). (Tr. 33–42 (Gross)). As to at least Item 65, Mr. Hollander personally was consulted by phone and had to be convinced of the item's falsity before authorizing Mr. Weslosky to add it to the list of prohibited statements. (Tr. 328–30 (Gross)). Thus, the testimony conclusively shows that the parties agreed that the statements included in Appendix 2 were false.

These negotiations focused almost exclusively on the INFOPAC–RDS product. It was INFOPAC–RDS that was compared to CONTROL–D in the First Advertisement. Fourth Dimension even obtained a ruling from this Court that Mr. Gross's demonstration during his deposition involve only the functions of INFOPAC–RDS. In any event, I credit Mr. Gross's testimony that most of the items included in Appendix 2 make sense only as applied to a report distribution product. (Tr. 30–31, 42–45, 330–31 (Gross)). Although Fourth Dimension notes that Mr. Gross distinguished in his deposition between INFOPAC and INFOPAC–RDS, (Gross

Dep. at 13–14, 266), the parties appear otherwise to have used the terms interchangeably. (Plaintiff's Exh. 1 ¶ 8 (prior Complaint using both terms); Gross Dep. at 13, 258 (Fourth Dimension counsel referring to INFOPAC)). Fourth Dimension's counsel stressed that "if I use the term INFOPAC, I am referring to INFOPAC–RDS." (Gross Dep. at 13; Miller Dep. at 110 (customer testifies terms used interchangeably)).

On May 17, 1993, counsel for Mobius sent a draft of a settlement agreement to counsel for Fourth Dimension. (Defendant's Exh. B). Yossie Hollander, Fourth Dimension's Chief Executive Officer who was responsible for approving the settlement agreement, (Tr. 135 (Hollander)), had two principal objections to that draft. First, the draft would have prohibited Fourth Dimension from making certain statements "or their equivalent." (Tr. 132 (Hollander); Defendant's Exh. B at 3). Hollander objected to this because he felt that no person could understand what an "equivalent" statement was. (Tr. 132 (Hollander 132)). Second, the draft had no provision permitting Fourth Dimension to make truthful statements. Hollander would not sign an agreement unless it contained a provision permitting truthful claims. (Tr. 141 (Hollander)). This "truthful claims provision" was included as paragraph 7 of the agreement to assure that Fourth Dimension would be free to make truthful comparative statements about Mobius products.[3]

Fourth Dimension also expressed concern about agreeing to bar statements about products that were subject to evolving technology. This concern was addressed by limiting the life of the Agreement to three years through what is commonly referred to as a "sunset clause." (Tr. 47–48 (Gross)).

The action finally was settled pursuant to a Stipulation and Agreement of Settlement dated June 7, 1993 (Plaintiff's Exh. 3; Tr. 25–27 (Gross)). The agreement included, among other things, the truthful statements provision (paragraph 7), the three year sunset provision, and a list of 65 statements that could not be said by Fourth Dimension because the parties had determined that they were false (Appendix 2). The overwhelming weight of the evidence establishes that the parties understood, agreed and intended (a) that the Appendix 2 Statements applied to the RDS product, (b) that the Appendix 2 statements were false, (c) that the intent of the Agreement was to bar Fourth Dimension from repeating those statements not just as applied to INFOPAC products generally but also and more particularly as applied to INFOPAC–RDS. (Tr. 42–45, 331–33 (Gross)).

### C. The Second Advertisement

In late 1993, Mobius and Fourth Dimension were competing for the business of M & I Data Services, Inc. ("M & I"), a Wisconsin company that processes customer statements and other data for banks. M & I signed a contract on December 31 to purchase INFOPAC–RDS, subject to an "acceptance clause" permitting it to test the product for 60 days and reject it if not satisfied. Starting in late 1993 and continuing into early 1994, M & I ran tests on both INFOPAC–RDS and CONTROL–D. (Tr. 50–53 (Gross)).

Fourth Dimension sent a letter to M & I on or about December 16, 1993, listing a series of purported advantages of CONTROL–D over INFOPAC–RDS that closely tracked the Appendix 2 Statements, but were phrased to avoid express mention of INFOPAC. After hearing Fourth Dimension's witnesses Michael Anderson and Thomas Trogdon testify about the origination of this letter, I find that Fourth Dimension understood both that the substance of the Appendix 2 Statements applied to the RDS product and that making such statements about INFOPAC–RDS would violate the Agreement. (Tr. 169, 175–76 (Anderson); Tr. 245–49 (Trogdon)).

On or about January 6, 1994, Charles Miller, an M & I employee principally involved with the testing of CONTROL–D and in favor of M & I's purchasing the Fourth Dimension product, telecopied to Thomas Trogdon, Fourth Dimension's Vice–President in charge of marketing in the Midwest, a two-page document purporting to reflect one

---

**3.** As I conclude below, this truthful claims provision had no bearing on the Appendix 2 statements—the parties had determined the Appendix 2 statements to be false.

set of results emanating from the testing. (Defendant's Exh. L (the "January 6 Chart")). Mr. Miller did not create the document, and was only involved to a minor extent in the underlying testing of the INFO-PAC product. No Fourth Dimension representatives were directly involved in the IN-FOPAC testing. (Miller Dep. at 20–21, 35–36, 57; Tr. 214 (Anderson)).

The January 6 Chart—which was the sole basis offered at trial by Fourth Dimension for the truth of its statements (Tr. 169 (Anderson))—does not indicate many important variables underlying the testing, does not reflect changes in subsequent testing leading to different results, and does not establish the basic functional abilities of either product. (Tr. 334–41 (Gross)). It provided, at best, a snapshot of certain results of the testing being conducted at that point. (Tr. 219 (Anderson)).

On January 10, 1994, Mr. Trogdon sent to Mike Hayford, a Senior Vice–President of M & I, a two page letter accompanied by an eight page memo outlining purported cost savings of nearly $5.6 million that would accrue to M & I if it chose CONTROL–D over INFOPAC–RDS. (Defendant's Exh. K (the "Second Advertisement")). Michael Anderson, a Fourth Dimension technical manager who assisted in preparing the Second Advertisement, defended its truth only as applied to testing data contained in the January 6 Chart, and disclaimed any knowledge of subsequent testing. (Tr. 219 (Anderson)). Mr. Anderson never saw the INFOPAC–RDS User's Manual, never saw the product's source code, had no regular experience running the product, and thus admitted that he did not know all the things INFOPAC–RDS can do. (Tr. 211–13 (Anderson)).

Mr. Anderson conceded that much of the Second Advertisement would be false, or its truth or falsity would be beyond his knowledge, if the document were read as applying to the overall functions and capabilities of INFOPAC–RDS. (Tr. 219–25 (Anderson)). However, the Second Advertisement on its face purports not to summarize particular testing but to "prove" that CONTROL–D will provide savings over INFOPAC in actual use. (Defendant's Exh. K, p. 2 of 8). Indeed, Mr. Trogdon confirmed that the Second Advertisement was meant to contrast the *basic capabilities* of the two products. (Tr. 249 (Trogdon)). In fact, despite some attempt at the inclusion of a disclaimer, Fourth Dimension made blanket statements about the capabilities of Mobius's product—statements that were untrue, indeed, some of which that had been demonstrated false during the previous litigation.

## D. Specific Statements in the Second Advertisement

### 1. Statements Regarding Dynamic Space Allocation

The Second Advertisement purported to contrast the abilities of CONTROL–D and INFOPAC–RDS to store data efficiently:

> VSAM datasets require a pre-defined allocation of DASD space, and this pre-allocation of space for each job/report must be at least large enough to handle the largest output from a job for any given day/week/month/year. The tests conducted by M & I Data used optimal VSAM parameters for the number of lines done in the test. If at any time during the year, there will be more lines in the report than in the test, the job will abend on B37. In reality, M & I Data Services will probably allocate the VSAM file as large as the largest annual report! Because its [sic] not possible to free the space at the end of the job, the actual compression rate of Infopac will be 0 or even larger than the non-compressed allocation (on regular daily runs).

(Defendant's Exh. K, p. 5 of 8).

As explained by Mr. Gross, this paragraph claims (1) that INFOPAC–RDS requires users to determine in advance the amount of disk space to be allocated to each "dataset," or file; (2) that the system will malfunction if reports containing more than the pre-allocated amount of space are processed, because additional space cannot be allocated dynamically (*i.e.*, at the time of need); and (3) that to avoid this result, INFOPAC requires over-allocation of space that cannot be reclaimed, with a negative result in "compression," or

storage efficiency. (Tr. 60–62, 65–70 (Gross)).

These claims repeat two of the Appendix 2 Statements: "INFOPAC provides for pre-allocated VSAM datasets" (Item 8), and "IN-FOPAC does not provide for dynamic allocation of required space" (Item 9). Fourth Dimension has offered no meaningful distinction between these statements on the one hand and the statements that INFOPAC's VSAM datasets "require a pre-defined allocation of DASD space" and a "pre-allocation of space" on the other. (Defendant's Exh. K at p. 5 of 8). I credit Mr. Gross's testimony that the statements are indistinguishable. (Tr. 60–62 (Gross).

Mr. Gross further explained, and Mr. Anderson agreed, that INFOPAC does *not* require pre-allocation of DASD storage space. To the contrary, INFOPAC provides for dynamic allocation of disk space—*i.e.*, automatic allocation of space at the time of need, rather than in advance. (Tr. 33–36, 65–75 (Gross); Tr. 197, 222 (Anderson)). Mr. Miller confirmed this in his deposition. (Miller Dep. at 63–73).

Mr. Anderson testified that the statement about space allocation in the Second Advertisement was meant only to suggest that INFOPAC required the pre-determination of certain parameters according to which space is later dynamically allocated in portions known as "extents":

> Q: [Y]our intended statement was that INFOPAC requires the parameters of the extent to be predetermined, not that the actual space needed to be allocated?
>
> A: Correct.
>
> * * * * * *
>
> Q: So it would be a false statement to say that the storage space had to be preallocated under INFOPAC?
>
> A: That is correct.

(Tr. 222 (Anderson)).

However, the Second Advertisement is plainly addressing the allocation of space, not the setting of parameters: INFOPAC's datasets are claimed to require "a pre-defined *allocation* of *space*," and this "*pre-allocation*

of *space*"—rather than the setting of parameters—must anticipate the largest possible report: using INFOPAC, "M & I Data Services will probably *allocate* the VSAM *file* as large as the largest annual report!" (Defendant's Exh. K, p. 5 of 8 (emphasis added)). By Fourth Dimension's own admission, then, the plain reading of its statement is false; I do not credit Mr. Anderson's testimony to the contrary.

The statement that with INFOPAC "its [sic] not possible to free the space at the end of the job," (Defendant's Exh. K, p. 5 of 8), is also false because INFOPAC provides for the automatic releasing of unused disk space. (Tr. 69–70 (Gross)). No Fourth Dimension witness disputed this. Fourth Dimension pointed only to a problem that M & I was having during testing with the space release function, but this was due to a set-up problem of M & I that did not require any programming change from Mobius. (Miller Dep. at 90–91; Tr. 301–02, 344 (Gross)).

In any event, for M & I to have a problem with a known feature of INFOPAC does not establish that the feature does not exist. Moreover, Fourth Dimension does not argue that the testing data suggests that INFO-PAC does not allocate space dynamically. Thus, even if the Second Advertisement could be read as making claims only with respect to the test results, the statements about space allocation would be false.

## 2. Statements Regarding Two Datasets

The Second Advertisement further stated:

> To the best of our knowledge, Info-pac/RDS creates two datasets—one for printing and one for on-line viewing. If we assume ... Infopac/RDS creates two datasets per report (when both print and on-line viewing are needed), then Info-pac/RDS must require at least 2 times the amount of DASD than CONTROL–D.

(Defendant's Exh. K, p. 4 of 8). Item 65 of Appendix 2 reads: "INFOPAC creates two VSAM datasets for every report version." Since it is undisputed that printing and viewing are critical functions of a report distribution system, the statement that INFOPAC creates two datasets for viewing and printing is in substance the same as the statement

that it creates two datasets for every report. (Tr. 62–63 (Gross)). Once again, the prohibited statement and the statement in the Second Advertisement are indistinguishable.

Mr. Gross also persuasively explained why the statement is false: INFOPAC *can* create two datasets for each report, but it can accomplish all of its basic functions by creating only one dataset. For example, a report may be stored and viewed in an On-line Archives dataset, and a hard copy may be printed out directly from that dataset. In certain circumstances, the user may choose to create a second dataset for printing, but that option is only selected if it is more efficient; in that instance, the second dataset is generally not stored but is instead discarded before the job finishes processing. Additional datasets—essentially extra copies—of particular files generally are not saved unless a back-up is desired. Thus, even where the INFOPAC user chooses to create a second dataset, the system does not use twice the amount of DASD storage space. (Tr. 37–41, 76–79, 341–44 (Gross)). Mr. Anderson did not dispute this explanation. (Tr. 221–22 (Anderson)).

Fourth Dimension's purported reliance on the testing data does not establish the truth of its "two dataset" statements. The statements in the Second Advertisement are phrased in terms of the product's basic capabilities—*e.g.*, "Infopac/RDS creates two datasets"—rather than expressly being limited to an evaluation of testing results. Moreover, the January 6 Chart does not establish that INFOPAC *always* creates two datasets—it only suggests that M & I had chosen to run the product that way for one particular test. (Tr. 334–38 (Gross)).

Fourth Dimension's false statements about dynamic allocation of space and the creation of two datasets were material. They went to the basic efficiency of the INFOPAC product, and Fourth Dimension itself attributed $2,256,000 of the alleged cost savings to these two factors alone. (Tr. 65 (Gross); Defendant's Exh. K at 2).

Fourth Dimension made these statements knowing they were false. Mr. Hollander personally reviewed the Second Advertisement before it went out and made changes to it. (Tr. 151 (Hollander)). He retained these statements despite knowing that Fourth Dimension had agreed that the same statements were false in the First Advertisement. (Tr. 45–48, 328–32 (Gross)). Mr. Trogdon, who signed the letter, also was familiar with the statements included in Appendix 2. (Tr. 245–46 (Trogdon)). And Mr. Anderson, who provided technical input for the Second Advertisement, knew at least that the statements regarding INFOPAC's allocation of DASD space were false. (Tr. 222 (Anderson)).

### 3. Statements Regarding AFP Printing

The Second Advertisement stated:

CONTROL–D has the ability to calculate the number of AFP pages that are printed by users thereby allowing for correctly charging back AFP printing to the users. *CONTROL–D is the only product that can do this.* Other products cannot determine when AFP page mode report pages begin or end, and with this limitation, users cannot be charged when printing AFP reports.

If we assume that M & I Data Services cannot charge back, say, $30,000 a month to customers for AFP printing or re-printing of AFP reports, this is revenue that M & I will be leaving on the table.... [extrapolation of "revenue loss"]

M & I personnel spend up to 20 hours a week (if not more) just re-printing AFP statements for the banks. CONTROL–D will allow the users at the banks (logged on via IMS/DC or CICS or VTAM) to request their own reprints of these statements without any intervention from M & I personnel, and CONTROL–D will automatically print the correct AFP characteristics with the statements.

(Defendant's Exh. K, p. 7 of 8 (emphasis added)).

Advanced Function Presentation (AFP) is an IBM product that allows for automated high speed printing of data and forms together, thus eliminating the need for expensive pre-printed forms for bank statements and similar reports. The ability to support AFP printing is a crucial function of any report

distribution software product. (Tr. 81–82 (Gross)).

The passage quoted above asserts (1) that INFOPAC–RDS cannot calculate the number of AFP pages printed, and thus does not enable users to charge their customers for printing, and (2) that INFOPAC–RDS cannot allow the customer of a user (*e.g.,* a bank serviced by M & I) to access the system directly to reprint a particular report. Fourth Dimension assigned five year costs to each of the two functions, making clear that the comparison being presented was between CONTROL–D and INFOPAC–RDS. (Defendant's Exh. K at 2; Tr. 224–25 (Anderson)).

These statements about the AFP capabilities of INFOPAC–RDS are false. INFOPAC–RDS determines page boundaries, stores each page, and makes a record of the number of AFP pages read and the output generated. Statistics, including the number of pages printed, are available to users in two different files, and INFOPAC–RDS users routinely charge their customers for AFP printing. Moreover, INFOPAC–RDS provides for customers of users to access the system directly to reprint reports, either by storing AFP printing commands with the pages originally printed, or by automatically inserting print commands when reprints are requested. (Tr. 81–89 (Gross)).

Fourth Dimension did not claim at trial that the M & I testing data supported the specific claims about AFP printing described above. It pointed only to a temporary problem that M & I had with INFOPAC–RDS in printing out single pages within reports. However, Mr. Gross testified, without contradiction, that this resulted not from a problem with the INFOPAC software, but from M & I's initial failure to provide certain indexing information necessary for INFOPAC–RDS to interface properly with M & I's systems. (Tr. 86–87 (Gross)).

### 4. Statements Regarding Processing Time

The Second Advertisement contained two challenged statements about INFOPAC–RDS's processing efficiency. First, in comparing test results of the two products, Fourth Dimension claimed that CONTROL–

D's actual processing time would be less than indicated because it, unlike INFOPAC–RDS, could write reports directly to a dataset, without first requiring creation of an intermediate file:

> Infopac/RDS will always require the intermediate file (with all possible B37 danger); therefore, the Infopac/RDS results represent a true figure.

(Defendant's Exh. K, p. 2 of 8). The reference to "B37 danger" indicates the increased risk of malfunction that would allegedly accompany this extra necessary step. (Tr. 92–94 (Gross)).

The statement that INFOPAC–RDS always requires creation of an intermediate file is false. As Mr. Gross explained, INFOPAC permits users to write reports directly to datasets through the use of the INFOPAC–RDS Application Program Interface (API), which serves as an interface between the user's system and the INFOPAC dataset. (Tr. 92–94 (Gross)). Mr. Anderson testified that he had no reason to doubt that INFOPAC–RDS had the ability to avoid the intermediate file, although he believed this would require additional programming. He admitted that Fourth Dimension's statement about the intermediate file was false as applied to INFOPAC–RDS generally. (Tr. 219–21 (Anderson)).

The Second Advertisement also repeated the "two dataset" statement in claiming superior processing efficiency:

> The hard copy reports are also designated (eventually) for on-line viewing. In such a case, Infopac/RDS will create a second data set, and therefore will run even longer. We have included an estimate for it as well (20% longer).

(Defendant's Exh. K, p. 3 of 8). This statement is false for the same reasons described above: INFOPAC–RDS does not always create two datasets, and in fact is designed to do so only when that choice results in greater processing efficiency. (Tr. 76–78 (Gross)).

### 5. Statements Regarding Spool Space Reduction

The Second Advertisement also made claims about CONTROL–D's allegedly

unique ability to regulate storage space in connection with printing reports:

> CONTROL–D is the only product that can regulate the amount of print output that is sent to the JES Spool for printing.... Unlike Infopac/RDS, CONTROL–D will not reclaim the DASD it "saves" you by bypassing the Spool.

(Defendant's Exh. K, p. 6 of 8).

The Spool is a key component of IBM computers that controls routing to and operation of peripheral devices such as printers. Fourth Dimension's claim is that INFOPAC–RDS does not have the ability to control the flow of output headed for the printer, with the result that reports waiting to be printed will take up inordinate amounts of disk storage space. Thus, Fourth Dimension claims, even if INFOPAC–RDS is able to bypass the Spool by writing reports directly to datasets, it will "reclaim" the space thus saved by wasting it at the printing stage. (Tr. 95–98 (Gross)).

Fourth Dimension's statement about controlling the flow of output to the printer is false. First, Fourth Dimension did not dispute Mr. Gross's testimony that other products regulate output to the printer in precisely the same way as CONTROL–D—by "chunking" output by number of lines. (Tr. 345 (Gross)). Nor does Fourth Dimension dispute that INFOPAC–RDS also permits the amount of output to be regulated through a different mechanism, the creation of "report groups," which permit material to be sent to the Spool in various regulated combinations and categories. (Tr. 96, 345–46 (Gross)). Fourth Dimension's argument that report groups must be set up in advance and are not created automatically, (Tr. 203–04 (Anderson)), is irrelevant to the truth of its claim in the Second Advertisement that IN-FOPAC cannot "regulate the amount of print output."

The additional false statements described above were material. They went to basic functions and features of the INFOPAC–RDS product, and purported to establish an additional nearly $3 million advantage for using CONTROL–D. (Tr. 99 (Gross); Defendant's Exh. K at 2). Overall, if the claims in Fourth Dimension's letter were true, Mr.

Trogdon agreed that M & I would have been crazy to buy INFOPAC–RDS. (Tr. 250 (Trogdon)).

## E. The Impact of the Second Advertisement

After receiving Fourth Dimension's document, M & I became suspicious of Mobius, began questioning INFOPAC–RDS product, and expanded its testing. Mobius personnel in several areas—including product development, technical support, and sales—were mobilized to convince M & I that Fourth Dimension's statements were false and that the INFOPAC product in fact did what Mobius claimed. (Tr. 100–03 (Gross)). I find that Mobius's response to devote additional personnel and resources to respond to the Fourth Dimension letter to save the M & I sale was reasonable. This effort involved several senior employees who would not otherwise have been involved in a routine installation, including Mr. Gross himself, Mobius's Executive Vice–President Joseph Albracht, Walter Giernoth, a senior systems troubleshooter, Kary Kleeman, regional marketing manager for the Midwest, and Joe Tinorello, national sales manager. (Tr. 264–76 (Gross)).

M & I, which had signed the contract to purchase Mobius's product at the end of December, 1993, had a contractual right to back out of the contract for a period of 60 days (the "acceptance clause"). (Tr. 52 (Gross)). This acceptance period, therefore, expired by the end of February, 1994. M & I ultimately decided not to exercise this right under the acceptance clause to cancel its contract to buy INFOPAC–RDS.

Mr. Gross offered estimates of the time devoted to Mobius's efforts to correct the confusion caused by Fourth Dimension's false statements, based on his personal knowledge of Mobius's operations and backed up where possible by business records of Mobius. (Tr. 103–10, 264–79 (Gross); Plaintiff's Exh. 8; Plaintiff's Exh. 9). Mr. Gross estimated that the time and expenses devoted to the corrective effort through April 1994 totalled approximately $50,402. Although this figure would have been reason-

able had the effort continued through April, I find that the efforts to convince M & I of the falsehood of Fourth Dimension's letter and repair the relationship with M & I substantially had ended by the end of February; those efforts undertaken thereafter related to implementation of M & I's system rather than repairing damage caused by Fourth Dimension's statements. Thus, Mobius has met its burden of proof that it incurred costs while taking reasonable corrective steps before the end of February, but, Mobius has failed to prove that it took actions (and incurred costs) after that time that it would not have taken in any customer implementation context. After examining the records admitted into evidence, as explained by Mr. Gross, I calculate that Mobius expended costs in the amount of $21,008.80 to reasonably respond to Fourth Dimension's false statements.[4]

Finally, I find that Mobius's relationship with M & I suffered long term damage by Fourth Dimension's actions, despite Mobius's reparative actions. I credit Mr. Gross's testimony that Mobius's relationship with its customer has been harmed with the result of a loss of trust and goodwill between Mobius and M & I. (Tr. 278 (Gross)).

### F. Fourth Dimension's Bad Faith

Fourth Dimension acted in bad faith by issuing the Second Advertisement. Fourth Dimension already had been sued for making many of the same false statements about INFOPAC in its First Advertisement; based on Mr. Gross's testimony regarding the settlement negotiations described above, which

I credit, and on the testimony of Messrs. Hollander, Anderson, and Trogdon, which I do not, I find that the Fourth Dimension personnel involved in the Second Advertisement knew that some of the statements in the Second Advertisement were prohibited by the settlement agreement because they were false.

Moreover, as to *all* of its false statements, Fourth Dimension was at least reckless: claiming no other basis for its statements than a single two-page document reflecting the results of one set of tests, it made a series of flat statements about the basic functions and capabilities of INFOPAC–RDS— even though, as Mr. Hollander admitted, Fourth Dimension really has "no way of knowing" whether statements it makes about its competitors' products are true. (Tr. 122 (Hollander)). Moreover, Fourth Dimension has never retracted any of its false statements about INFOPAC–RDS. (Miller Dep. at 111).

In sum, after examining the various witnesses at trial and reviewing the other evidence presented, I do not credit Fourth Dimension's claims that it believed its statements about INFOPAC–RDS to be true: it is clear to me that Fourth Dimension knew that several of the statements were false; as to the other statements, because Fourth Dimension had little or no basis for its statements, it is clear that Fourth Dimension simply did not care whether its letter was true. In particular, I note the testimony of Mr. Anderson, whose testimony I affirma-

---

4. Mobius presented documentary evidence showing that the following Mobius personnel expended time between January 10 and February 28, 1994 saving the M & I sale:

| | | |
|---|---|---|
| • Garrity | 16.0 | hours |
| • Giernath | 140.0 | hours |
| • McGuigan | 4.5 | hours |
| • Jaffier | 1.0 | hour |
| • Kleeman | 32.0 | hours |
| • Labono | 8.0 | hours |
| • Morgan | .5 | hours |
| • Milton | 32.0 | hours |
| • Ortiz | .5 | hours |
| • Yokubonis | 8.0 | hours |

(Plaintiff's Exhs. 8, 9). In addition, Mr. Gross testified that he personally spent a total of 40 hours through the end of April. (Tr. 272 (Gross)). Reducing this figure to show only the time spent before the end of February, I estimate that Mr. Gross spent 20 hours on the M & I sale from January 10 through the end of February.

Based on the testimony of Mr. Gross, I have assigned rates to the employee hours depending upon the employees' job descriptions. I find the following rates to be close approximations of the personnel costs incurred by Mobius for the hours expended by the various personnel: (1) $150 per hour for Gross, the founder of Mobius; (2) $75 per hour for Giernath, the main "trouble-shooter" for Mobius, and for Kleeman, a regional manager; and (3) $50 per hour for everyone else.

Finally, Mobius presented documentary evidence as to disbursements relating to saving the M & I sale. The records show that a total of $1583.80 in out-of-pocket expenses was expended by Mobius to save the sale.

tively do *not* credit, and that of Mr. Hollander, who admitted that he had no basis for knowing the capabilities of another product.

## II. Conclusions of Law

### A. Breach of Contract

■■■ Interpretation of settlement agreements follows general contract law principles. When confronted with a contract provision that is ambiguous, a district court "may properly consider evidence extrinsic to the contract itself, including testimony offered by the parties." *In Time Products, Ltd. v. Toy Biz, Inc.*, 38 F.3d 660, 665 (2d Cir.1994) (citing *In re Consolidated Mutual Insurance Co.*, 77 N.Y.2d 144, 565 N.Y.S.2d 434, 436, 566 N.E.2d 633, 635, (1990)); *see Kinek v. Paramount Communications, Inc.*, 22 F.3d 503, 509 (2d Cir.1994). In this case, I found at the summary judgment stage that the settlement agreement was ambiguous as to whether the use of the enumerated statements listed in Appendix 2 categorically was prohibited, as asserted by Mobius, or whether they were prohibited only if false, as argued by Fourth Dimension. The parties, therefore, were allowed to present testimony on the significance of the Appendix 2 list. Moreover, because of the technical nature of the subject matter at issue in this case, testimony was necessary to determine whether the statements made were true or false.

■■■ To summarize my findings of fact above, I found the following about the meaning of the settlement agreement. First, the previous settlement agreement and the Appendix attached thereto set out statements that could not be made by Fourth Dimension specifically about Mobius's INFOPAC–RDS product. Second, although Fourth Dimension reserved the right to make truthful statements about the Mobius product, the parties in the agreement had determined that the 65 statements about Mobius listed in Appendix 2 were false. The only provision for ever using those statements was included in the three year sunset provision which was included because the truth or falsity of the statements may change over time given the dynamic nature of the technology at issue. To further summarize, I found that the advertisement sent to M & I did include statements that were, in substance, the same as those prohibited by the settlement agreement. Fourth Dimension, therefore, has breached the settlement agreement. None of its arguments to the contrary is persuasive.

Fourth Dimension first argues that the settlement agreement related to all of the INFOPAC family of software products and not specifically INFOPAC–RDS. As I stated above, this position is not consistent with the evidence. First, I credit Mr. Gross's testimony as to what product was the subject of the previous litigation and that most of the itemized statements only made sense as they related to a report distribution system. Second, I issued an order directing Mr. Gross only to discuss the INFOPAC–RDS product at his demonstration during his deposition. Third, given the fact that the INFOPAC–RDS product originally was referred to simply as INFOPAC, a construction that continues to this day with some customers, it was reasonable to use only that name in the settlement agreement. Fourth, I note that the defendant's own witnesses stated that they were referring to INFOPAC–RDS when saying only INFOPAC. It is clear to me that the settlement agreement related to the INFOPAC–RDS product specifically.

■■■ Fourth Dimension next argues that the statements in the second advertisement, as a matter of law, could not violate the settlement agreement because they were not the exact statements that were included in Appendix 2. In support of their argument, Fourth Dimension points to a clause that was omitted from the original draft of the agreement. That clause provided that Fourth Dimension would have been prohibited from using the statements contained in Appendix 2, or their equivalent. That provision was omitted at the suggestion of Mr. Hollander because he thought that no person could understand what an "equivalent" statement was. (Tr. 132 (Hollander)). Fourth Dimension now asserts that the omission of this clause leads to the conclusion that it can use the Appendix 2 statements in substance as long as it does not use the statements as written. This argument is specious, at best.

The deletion of the word equivalent, a word that could lead to ambiguity and that could be construed to have relatively broad application,[5] does not mean that the prohibited statements may be made if placed in different syntax. If Fourth Dimension could avoid the prohibitions of the settlement agreement merely by changing sentence structure or by using synonyms, the agreement would be meaningless—I refuse to interpret it in such an illogical way.

Fourth Dimension next argues that the statements were not, in substance, the same as those listed in Appendix 2. As found above, however, the statements made in Fourth Dimension's advertisement to M & I were the same, in substance, as the statements listed in Appendix 2.

■ Fourth Dimension's final argument on the breach of contract claim is that they cannot be liable because the statements in their advertisement to M & I were true. Mr. Hollander, for example, testified that, while insisting on the inclusion of the "truthful statement" provision of the settlement agreement, included in paragraph 7 of the agreement, his intention was to ensure that Fourth Dimension could always say truthful information about Mobius. Mr. Hollander, therefore, stated that he did not care what went into Appendix 2—in his view, the company still could use Appendix 2 statements as long as they were true.

Mr. Hollander's arguments do not affect the conclusion of breach, however, for two reasons. First, as a matter of law, Mr. Hollander's subjective intentions are irrelevant to the determination of what the intentions of the parties were in making the agreement. As the Second Circuit has stated, "[a]s a fundamental matter, the objective of contract interpretation is to give effect to the *ex-pressed* intentions of the parties." *Kimmins Indus. Service Corp. v. Reliance Insurance Co.*, 19 F.3d 78, 81 (2d Cir.1994) (emphasis added). Moreover, "[a] party's actual or secret intent is immaterial to the formation of a contract." *LCA Leasing Corp. v. Borvig Corp.*, 826 F.Supp. 776, 779 (S.D.N.Y.1993) (Sprizzo, J.). In the instant case, Hollander never expressed his interpretation of the truthful statements clause to anyone at Mobius, nor was there testimony that anyone else from Fourth Dimension expressed this interpretation. Indeed, it is doubtful that Mr. Hollander's testimony is properly admissible to determine the intentions of the parties, as Fourth Dimension could not establish a foundation that the subjective intention was expressed to Mobius. Even fully considering this testimony of his unexpressed intent, I do not credit Hollander's testimony about his intentions. Instead, I credit Mr. Gross's testimony that the Appendix 2 statements were determined by the parties to be false and, by implication, the true statement clause would not affect the application of Appendix 2.[6] Moreover, even if Fourth Dimension's true statements provision defense was legally defensible, it still would be irrelevant to this case—I found above that as a matter of fact, Mobius has shown that the statements were false.

Because Fourth Dimension has made statements about Mobius that, in substance, were explicitly prohibited by the parties' settlement agreement, Fourth Dimension has breached the agreement and is liable to Mobius for damages incident thereto. Before discussing damages, however, I first will address Mobius's other claims for relief.

### B. Lanham Act Claims

Mobius also claims that, because the statements made by Fourth Dimension were false,

---

5. The word equivalent, for example, can mean of equal value or equal strength. *See Webster's Third New International Dictionary*. Each of these concepts is considerably broader and more ambiguous than the concept of merely being the same in substance.

6. I am not convinced by Fourth Dimension's argument that my interpretation would render the true statements provision superfluous; the provision helped to make it clear that the settlement agreement was limited to prohibiting Fourth Dimension from saying only certain specific false statements, *i.e.*, those set out in Appendix 2. Even if I was convinced that my interpretation would render the true statements provision superfluous, I would still decide this issue the same way because Fourth Dimension's contrary interpretation would be worse—it would render the *entire* settlement agreement meaningless.

the Second Advertisement violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Section 43(a) of the Lanham Act provides, in pertinent part, that

> [a]ny person who ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B). This section provides protection against a "myriad of deceptive commercial practices," including false advertising. *Resource Developers v. Statue of Liberty–Ellis Island Foundation*, 926 F.2d 134, 139 (2d Cir.1991). Mobius seeks both injunctive and monetary relief under this section. Because the elements of a § 43(a) action are slightly different for each type of relief, I will address each in turn.

### 1. Injunctive Relief

■ To make out a claim under § 43(a) sufficient to entitle the plaintiff to injunctive relief, the plaintiff must show that defendant: (1) has made material misrepresentations about the nature, characteristics or geographic origin of either defendant's or plaintiff's goods or services; (2) has used the false or misleading representations "in commerce;" (3) has made the representations in the context of commercial advertising or commercial promotion; and (4) has made plaintiff believe that he or she is likely to be damaged by the misrepresentations. *See Towers Financial Corp. v. Dun & Bradstreet, Inc.*, 803 F.Supp. 820, 823 (S.D.N.Y. 1992) (citing *McNeil–P.C.C., Inc. v. Bristol Myers Squibb Co.*, 938 F.2d 1544, 1548–49 (2d Cir.1991); *National Artists Management Co. v. Weaving*, 769 F.Supp. 1224, 1230 (S.D.N.Y.1991); *McCarthy on Trademarks*, § 27.04[1][a].

### (a) False Statement in Commerce

The first two requirements clearly are satisfied in the instant case. As for the first requirement, I found above that the defendant made materially false statements about the nature and characteristics of Mobius's software program. As to the second, there has been no argument that Fourth Dimension's statements about Mobius were not "use[d] in commerce," nor would there be any grounds for such an argument. Fourth Dimension used the instrumentalities of interstate commerce to make misrepresentations of Mobius's product, which was in interstate commerce, to promote its own product in interstate commerce.

### (b) Commercial Advertising or Promotion

■ Defendant argues,[7] however, that its letter to M & I "did not constitute commercial advertising or promotion within the meaning of section 43(a)" because it was merely a single letter rather than an advertisement disseminated to the public. (Defendant's Response to Plaintiff's Proposed Findings of Fact and Conclusions of Law at 4 n. 7). According to defendant, therefore, plaintiff's Lanham Act claim must fail. I disagree.

In a recent case, another court in this district examined this very issue of what constitutes commercial advertising or promotion under § 43(a). In *Gordon and Breach Science Publishers S.A. v. American Institute of Physics*, 859 F.Supp. 1521 (S.D.N.Y.1994), Judge Sand analyzed the legislative history and relevant precedent behind the § 43(a) "commercial advertising or promotion" requirement. He concluded that, in order for a misrepresentation to meet this requirement, the communication had to meet a four-part test: (1) it must constitute commercial speech; (2) it must be made by a defendant who is in commercial competition with plaintiff; (3) for the purposes of influencing the purchase of its goods and services; and (4) "[w]hile the representations need not be made in a 'classic advertising campaign,' but may consist of more informal types of 'promotion,' the representations ... must be disseminated sufficiently to the relevant pur-

---

**7.** Defendant's argument on this issue was raised for the first time in a footnote in its reply to plaintiff's proposed findings of fact. Defendant has not given a reason as to why this potentially dispositive argument was not raised during the substantial summary judgment practice that occurred in this case.

chasing public to constitute 'advertising' or 'promotion' within that industry." *Id.* at 1535–36.

In the instant case, the first three parts of the test easily are met. First, commercial speech is defined as "speech proposing a commercial transaction." *United States v. Edge Broadcasting,* —— U.S. ——, ——, 113 S.Ct. 2696, 2703, 125 L.Ed.2d 345 (1993). Fourth Dimension's letter to M & I was an explicit invitation to purchase Fourth Dimension's product over that of Mobius. Second, Mobius and Fourth Dimension are in direct competition with one another. Third, Fourth Dimension's letter on its face was made for the express purpose of influencing the purchase decision of M & I.

The more difficult issue is whether Fourth Dimension's letter was "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Gordon and Breach,* 859 F.Supp. at 1535–36. After examining the relevant caselaw and taking into account the remedial purposes of the Lanham Act, I conclude that it was. It is clear that the primary concern of Congress in requiring "commercial advertising or promotion" was to ensure that the Lanham Act did not reach speech that did not promote a competitor's product. This requirement ensures that political, social, informational or incidental representations are beyond the scope of the Act—only promotional representations that are directed at the purchasing public can be reached by § 43(a). *See, e.g., National Artists Management Co. v. Weaving,* 769 F.Supp. 1224, 1233 (S.D.N.Y.1991) ("Section 43(a) 'has never been applied to stifle criticism of the goods or services of another by one ... who is not engaged in marketing or promoting a competitive product or service'" (quoting *Wojnarowicz v. American Family Ass'n,* 745 F.Supp. 130, 141–42 (S.D.N.Y. 1990)).

An examination of the cases finding no commercial advertising or promotion fall into one of these non-promotional categories of speech that lie beyond the scope of § 43(a). In *American Needle & Novelty v. Drew Pearson Marketing,* 820 F.Supp. 1072 (N.D.Ill.1993), for example, the court refused to hold defendants liable for one letter "privately addressed to a *non-consuming* licensor." *Id.* at 1078 (emphasis added). In *Marcyan v. Nissen Corp.,* 578 F.Supp. 485 (N.D.Ind.1982), *aff'd,* 725 F.2d 687 (7th Cir. 1983) (Table), the court held that misrepresentations contained in the defendant's user's manual was not actionable because they were not used in promotion of the product. In *Vitale v. Marlborough Gallery,* No. 93 Civ. 6276 (PKL), 1994 WL 654494, (S.D.N.Y. July 5, 1994), Judge Leisure refused to impose § 43(a) liability on the basis of allegations that the defendants were planning on producing a catalogue containing false representations in the future. *See id.* at *6. In *Gordon and Breach Science Publishers S.A. v. American Institute of Physics,* 859 F.Supp. 1521 (S.D.N.Y.1994), a case concerning allegedly false statements contained in academic journals, Judge Sand concluded that the plaintiff's allegations were not "sufficient to convert fully protected commentary into less-protected commercial speech." *Id.* at 1541. In *Hertz Corp. v. Avis, Inc.,* 725 F.Supp. 170, 171 (S.D.N.Y.1989), *vacated on other grounds by,* 732 F.Supp. 26 (S.D.N.Y. 1990), Judge Duffy refused to impose Lanham Act liability for an advertisement in a travel agent magazine because the ad never reached consumers of the rental car service. Each of these cases demonstrate that the commercial advertising requirement is meant to deny relief in those cases where the false advertising does not reach the people that matter most under the Lanham Act—the consumers. *See id.* ("Advertising that is not misconceived, misunderstood, *or that fails to reach the consuming public* does not come within the purview of the Lanham Act, which is aimed primarily at *consumer* protection." (emphasis added)).

In the instant case, Fourth Dimension's letter to M & I was "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." The letter concerned the competing products, promoted Fourth Dimension's product over that of Mobius, and was aimed directly at a purchaser, indeed, a purchaser that was about to buy plaintiff's product. As I found above, the relevant purchasing mar-

ket is quite small—tainting the goodwill of plaintiff with one purchaser could easily affect another purchaser's view. Moreover, in this case the true relevant purchasing public consisted solely of M & I. Fourth Dimension learned of M & I's impending purchase of Mobius's product, and, in bad faith, by way of a knowingly and materially false letter, made a last-ditch effort to torpedo Mobius's sale and convince M & I to buy its product instead. Although I recognize that § 43(a) "does not have boundless application," *Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237 (2d Cir.1974), to label this behavior as anything but "commercial advertising or promotion" would defeat the broad remedial purposes of the Lanham Act. *See, e.g., PPX Enterprises v. Audio Fidelity Enterprises*, 818 F.2d 266, 270 (2d Cir.1987) (recognizing that, although early interpretations of the Act were narrow, subsequent interpretations demonstrate that the Act reaches a wide variety of deceptive commercial practices); *Gordon and Breach*, 859 F.Supp. at 1532 ("Section 43(a) of the Lanham Act has been characterized as a remedial statute that should be broadly construed.") (citing *PPX Enterprises* ).

In sum, although Fourth Dimension's letter was not a "classic advertising campaign," given that Fourth Dimension's letter (a) was presented directly to M & I, a company known to be in the market for the product, and (b) expressly was designed to discourage M & I from purchasing Mobius's product and buy its product instead, I hold that the letter constituted "commercial advertising or promotion under § 43(a)." *See North Shore Medical Center, Ltd. v. Evanston Hospital Corp.*, No. 92 C 6533, 1993 WL 141717 at *3 (N.D.Ill. April 28, 1993) (recognizing that under broad remedial purposes of § 43(a), "courts have held that false representations contained in private letters sent from one company to another are actionable under § 43(a) of the Lanham Act."); *National Artists Management Co. v. Weaving*, 769

F.Supp. 1224 (S.D.N.Y.1991) (holding that even private, partially social phone conversations could be actionable if defendant therein promoted her services over that of plaintiff); *Radio Today, Inc. v. Westwood One, Inc.*, 684 F.Supp. 68, 74 (S.D.N.Y.1988) ("The Lanham Act does not apply merely to false advertising through traditional media channels, but to a broad range of deceptive statements made in connection with the sale of goods or services."). In my view, this conclusion does nothing to expand the scope of established § 43(a) liability—Fourth Dimension made a false statement directly to a prospective purchaser, for the purpose, indeed the sole purpose, of promoting its product and disparaging another's product. Section 43(a) is written in the disjunctive—it requires commercial advertising *or* promotion. Acceptance of Fourth Dimension's argument that its letter does not constitute commercial advertising or promotion effectively would write the word "promotion" out of § 43(a).

**(c) Tendency to Damage the Plaintiff**

 The final element[8] that plaintiff needs to show to be entitled to injunctive relief is that defendant's misrepresentations harmed the plaintiff. The plaintiff need not show actual damage, but rather need only show that it is likely that defendant's actions have caused or will cause damage. *See Ortho Pharmaceutical Corp. v. Cosprophar*, 32 F.3d 690, 694 (2d Cir.1994); *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir.1980). To prove such likelihood of injury, the plaintiff "must also show a logical causal connection between the alleged false advertising and its own sales position." *Johnson & Johnson*, 631 F.2d at 190; *see also Ortho*, 32 F.3d at 694. In order to do so, the plaintiff must show that the misrepresentations have a tendency to deceive the purchasing public and the tendency is likely to cause harm to the plaintiff. *See Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 316–17 (2d Cir.1982). Although such deception is usually shown with consum-

---

8. This requirement of showing a tendency to be harmed is sometimes discussed as a substantive element of the Lanham Act claim and at other times discussed as a standing requirement. *Compare Ortho Pharmaceutical Corp. v. Cosprophar*, 32 F.3d 690, 694 (2d Cir.1994) (standing

requirement) *with McNeil–P.C.C., Inc. v. Bristol Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991) (substantive element). Because the analysis is the same under either approach, it makes little difference which way it is interpreted.

er surveys and other such evidence, when the misrepresentation is "literally or explicitly false," as in this case, "the court may grant relief without reference to the advertisement's impact on the buying public." *Id.* at 317; *see also Barr Laboratories, Inc. v. Quantum Pharmics, Inc.,* 827 F.Supp. 111, 117 (E.D.N.Y.1993) ("[A] plaintiff must show (1) that some consumers were actually confused by the defendant's false advertising *or* that the defendant deliberately or intentionally advertised its product falsely, which would pretermit a showing of actual consumer confusion and (2) that the plaintiff's injury was caused by the defendant's false advertising."). Furthermore, in cases concerning misleading comparisons, such as the instant case, irreparable harm warranting injunctive relief will be presumed. *See McNeilab, Inc. v. American Home Products Corp.,* 848 F.2d 34, 38 (2d Cir.1988). In the instant case, this presumption of irreparable harm governs and, therefore, plaintiff has made out its case for injunctive relief. Moreover, even without the assistance of the presumption, plaintiff still would prevail; as I found above, defendant's letter caused M & I to conduct additional testing and to question plaintiff's product to the point that plaintiff reasonably devoted additional personnel to counteract the letter and salvage its sale. This is more than sufficient to satisfy the standard of showing a tendency to deceive and a causal connection to the harm suffered.

Thus, plaintiff has satisfied all the elements of a § 43(a) claim for injunctive relief. Whether I will exercise my discretion to grant such relief will be addressed below.

### 2. Claim for Monetary Damages

■ Mobius also seeks monetary relief for the damages caused by Fourth Dimension's letter to M & I. To show entitlement to monetary damages under § 43(a), a plaintiff must show an additional element—he or she must show *actual* damages rather than a mere tendency to be damaged. To do so, the plaintiff must show that he or she suffered

actual damages that were causally related to "actual consumer confusion or deception" of the purchasing public. *PPX Enterprises v. Audiofidelity Enterprises,* 818 F.2d 266, 271 (2d Cir.1987) (citing *Burndy Corp. v. Teledyne Industries,* 748 F.2d 767, 772 (2d Cir. 1984) and *Coca–Cola,* 690 F.2d at 316).

■ The plaintiff successfully has satisfied the actual consumer confusion or deception requirement. When a plaintiff is able to prove that a defendant "deliberately engaged in a deceptive commercial practice, . . . a powerful inference may be drawn that the defendant has succeeded in confusing the public. Therefore, upon a proper showing of such deliberate conduct, the burden shifts to the defendant to demonstrate the absence of consumer confusion." *Resource Developers v. Statue of Liberty–Ellis Island Foundation,* 926 F.2d 134, 140 (2d Cir.1991). As I found above, Fourth Dimension wilfully intended to mislead M & I about Mobius's product in order to gain a competitive advantage and derail Mobius's sale. This deceptive intent makes the presumption of consumer confusion appropriate. Fourth Dimension has failed to present proof that such deception did not occur.[9] Moreover, as I found above, even without the benefit of the inference, M & I was deceived at least to the extent of conducting additional tests and questioning Mobius's product more than it would have had it not received the misrepresentations in Fourth Dimension's letter.

Fourth Dimension argues that monetary damages are inappropriate both because M & I was not deceived and because that plaintiff did not suffer any damages causally related to their letter. In support of this argument, Fourth Dimension notes that Mobius did not lose the M & I sale. Although defendant cites *Burndy Corp. v. Teledyne Industries, Inc.,* 748 F.2d 767, 771, 773 (2d Cir.1984), and *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738, 744–46 (7th Cir.1985), for the proposition that lost sales are a prerequisite to obtaining money

---

**9.** Fourth Dimension argues that M & I was not deceived because it went ahead with the purchase of Mobius's product. As discussed more fully below, however, lost sales is only one measure of damage—in this case, Fourth Dimension's letter deceived M & I at least to the point

of conducting further tests of INFOPAC–RDS and to question Mobius about its product significantly more than it would have had the letter not been sent. This is sufficient to show deception and support an award of damages for Mobius's subsequent corrective measures.

damages under § 43(a), this is neither an accurate explanation of the law, nor even of the holding in *Burndy* or *Otis Clapp & Son.*[10] Although it is true that a plaintiff must show that he or she suffered some damage as a result of the defendant's misrepresentations, *see id.*, lost sales are only one of several types of damages that a defendant may sustain and recover. The District of Columbia Circuit, for example, listed the various types of actual damages that can be incurred due to false advertising: (1) lost profits from sales actually diverted; (2) profits lost from sales made at reduced prices; (3) the costs of completed corrective advertising that reasonably responded to the misrepresentation; and (4) quantifiable harm to the plaintiff's goodwill. *See Alpo Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969 (D.C.Cir.1990).

In the instant case, Mobius's claim for damages rests on the amount of corrective measures that it had to take to combat the defendant's misrepresentations and save the M & I sale. This basis of damages has been recognized not only by the D.C. Circuit in *Alpo*, but also by other circuits and in other courts within this district. *See U–Haul International, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1041 (9th Cir.1986) (recognizing validity of basing a damage award on corrective advertising measures); *Otis Clapp & Son, Inc.*, 754 F.2d at 745 (plaintiff reimbursed for the costs of corrective advertising incurred in response to the defendant's misrepresentations); *Grant Airmass Corp. v. Gaymar Industries, Inc.*, 645 F.Supp. 1507, 1514

(S.D.N.Y.1986) (sustaining claims for lost business, loss of reputation and corrective advertising at summary judgment stage); *Cuisinarts, Inc. v. Robot–Coupe International Corp.*, 580 F.Supp. 634, 636 (S.D.N.Y.1984) (monetary damages appropriate for corrective measures even without showing of lost sales).

I found above that Mobius was forced to undertake substantial additional marketing efforts to counteract the negative aspersions on its product and save its sale to M & I. These reparative efforts included the preparation of several memorandum to address Fourth Dimension's statements point-by-point, the assignment of personnel that would normally not have participated in the sales effort, and the devotion of significantly more follow-up resources to the customer than would have occurred had Fourth Dimension not made its misrepresentations. I also found above that the amount of corrective steps taken by Mobius was reasonable given the devastating effect that Fourth Dimension's statements, if believed, would have had on the ability of Mobius to consummate the M & I sale.

██ Mobius, therefore, has proven that it is entitled to monetary damages under § 43(a).[11]

### III. Damages Calculation

### A. Relief for Breach of Contract

██ A breaching party must put the non-breaching party into the same position

**10.** The conclusion in *Burndy* was the result of the court's finding that plaintiff had not demonstrated how its losses in profits were causally linked to the defendant's actions. *See Burndy*, 748 F.2d at 773.

In *Otis Clapp & Son, Inc.*, the Seventh Circuit found that the plaintiff failed to prove its claim for unrealized growth potential because it failed to prove that it lost any sales. *See Otis Clapp & Son, Inc.*, 754 F.2d at 745–46. The plaintiff's claim for the expenses of a curative advertising campaign, however, were fully paid by the defendant. *See id.* at 745.

**11.** The plaintiff also made a claim for common law unfair competition. To make out a claim of unfair competition under New York law, a plaintiff must prove that the defendant engaged in "commercial immorality" or in misappropriation of a benefit or property right for its commercial advantage. *See Towers Financial Corp. v. Dun & Bradstreet, Inc.*, 803 F.Supp. 820, 823 (S.D.N.Y.

1992). Because the elements of unfair competition in this case are satisfied by my analysis under § 43(a), I need not address this claim separately. The only additional element for unfair competition is a finding of bad faith, which I also have found in this case. *See Weight Watchers International v. Stouffer Corp.*, 744 F.Supp. 1259, 1283–84 (S.D.N.Y.1990) ("Common law unfair competition claims closely parallel Lanham Act unfair competition claims; to the extent that they may be different, the state law claim may require an additional element of bad faith or intent." (citing *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980)). As will be discussed more fully below, I will use the unfair competition claim only as an alternative basis for supporting a damages award above the amount of actual damages that are readily calculable.

as he or she would have been in had the breach not occurred. *See Adams v. Lindblad Travel, Inc.,* 730 F.2d 89, 92 (2d Cir. 1984). Contract damages, therefore, are designed "to compensate the injured party for the loss caused by the breach." *U.S. Naval Institute v. Charter Communications,* 936 F.2d 692, 696 (2d Cir.1991). In the instant case, had Fourth Dimension not breached the settlement agreement, Mobius would not have had to take additional steps to consummate the M & I sale. The most appropriate measure of damages, therefore, is the cost to Mobius of the corrective measures it was forced to undertake to counteract the false statements contained in the Second Advertisement that also were included in Appendix 2 of the settlement agreement. Because these statements were only a portion of all the false statements in the Second Advertisement, this measure will equal a portion of all the corrective damages that were necessary to save the sale. As I shall discuss below, the total cost of the corrective measures is the appropriate measure of damages for the Lanham Act § 43(a) claim—thus, because the contract damages constitute only a portion of the Lanham Act damages, the contract damages will not be calculated separately.

**B. Lanham Act Relief**

**1. Injunctive Relief**

■ Under § 34 of the Lanham Act, the district court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116. Under traditional equity standards, an injunction may not be issued without the showing that monetary relief is inadequate. Injunctive relief has been noted to be particularly appropriate in Lanham Act cases, however, indeed, the Supreme Court has stated that any doubt as to appropriateness of injunctive relief is to be resolved in the favor of plaintiff and against the defendant, "which has shown by its conduct that it cannot be trusted." *William R. Warner & Co. v. Eli Lilly & Co.,* 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161 (1924); *see also Imagineering, Inc. v. Van Klassens, Inc.,* 851 F.Supp. 532, 541 (S.D.N.Y.1994) (same) (citing *Champion Spark Plug Co. v.*

*Sanders,* 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947)). In the context of false advertising, in order to show inadequacy of monetary relief, the plaintiff must show "the likelihood that purchasers of the product may be misled in the future by the false advertising." *Burndy Corp. v. Teledyne Industries, Inc.,* 748 F.2d 767, 772 (2d Cir.1984).

■ In the instant case, the defendant argues that, because it has stopped making the statements contained in its letter to M & I, injunctive relief is inappropriate, citing *Burndy* for this proposition. *Burndy* stated that injunctive relief was not proper in cases where the defendant has ceased its wrongful activity and there is *no likelihood of repetition. See id.* at 774 (emphasis added). In the instant case, I found above that defendant repeated statements in bad faith that it knew to be false. Given this history of making knowingly false representations, there is some likelihood that, absent an injunction, Fourth Dimension will continue to make misleading representations about Mobius's product. An injunction to prevent such behavior is more than appropriate under the Lanham Act. *See id.; see also Polo Fashions, Inc. v. Dick Bruhn, Inc.,* 793 F.2d 1132, 1135 (9th Cir.1986) (where defendant was guilty of wilful infringement of trademark, plaintiff had no burden to introduce evidence of possible future infringement); *McCarthy on Trademarks,* § 30.06 ("[T]he reform of the defendant must be irrefutably demonstrated and total.").

The scope of the injunction must be as narrow as possible so as to avoid being overbroad and reaching non-violative activity. This concern is particularly present in false advertising cases where speech, and not merely conduct, is implicated. Balancing this concern with the need to protect plaintiff from future violative conduct, I conclude that the defendant shall be enjoined from making, exactly or in substance, those statements that already have been demonstrated to be false, that is, the 65 statements contained in Appendix 2 of the previous settlement agreement and the additional statements that I specifically have found to be false in this action that were not included in Appendix 2.

This injunction shall expire automatically on the third anniversary of the execution of the parties' settlement agreement—the parties had agreed that the statements may no longer be false after that date because of the rapid pace of change in the computer industry.[12] This formulation provides protection to plaintiff, yet is as narrow as possible—the only statements that defendant may not use are those that already have been determined to be false. Therefore, no non-misleading speech possibly can be limited or chilled. The parties shall submit proposed language for this injunction by December 15, 1994.

## 2. Monetary Damages

■ The correct measure of monetary damages in this case should be the amount of corrective action that Mobius reasonably took to combat Fourth Dimension's deceptive letter. I found above that Mobius has proved that it took reasonable actions to combat Fourth Dimension's letter through the end of February. Therefore, the damages should include those costs associated with the extra personnel and resources devoted to M & I after Fourth Dimension's letter through the end of February. Mobius has presented credible evidence sufficient to warrant a damages award for this period of $21,008.80. Although this calculation will not reflect Mobius's actual costs during this period exactly, once the existence of actual damages is established, a district court "may engage in 'some degree of speculation in computing the *amount* of damages.'" *PPX Enterprises v. Audio Fidelity Enterprises*, 818 F.2d 266, 271 (2d Cir.1987) (quoting *Burndy*, 748 F.2d at 771).

Mobius has argued that it is entitled to damages beyond this point in time for continued corrective advertising. I disagree for three reasons. First, I found above that the post-February costs related to implementation problems at M & I rather than efforts to convince M & I of the falsehood of the letter.

Second, once the M & I sale was safe, continued corrective efforts begin to become less reasonable—once Mobius repaired its relationship with its customer enough to save the sale, continued efforts need some other basis for their justification. Without evidence as to possible sales opportunities that could be jeopardized without the continued reparative actions or some other showing that Mobius still could be harmed by Fourth Dimension's actions, such an award would be inappropriate.[13] Third, Mobius's claims for damage to its goodwill, though credible and not speculative, are not quantifiable sufficiently to make any award calculable on the proof submitted by Mobius. The costs incurred by Mobius because of the loss of its goodwill are simply indistinguishable on the current record from those costs that it incurred merely to implement the M & I system.

■ Pursuant to § 35 of the Lanham Act, a court has the power to assess damages, "according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C. § 1117(a). Such enhancement of the award, however, "shall constitute compensation and not a penalty." *Id.* Although punitive damages are inappropriate under the Lanham Act, in cases of wilful violation of the Act, this enhancement may be used to deter further wilful violations. *See Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir. 1988), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989).

■ In the instant case, I find it appropriate to enhance the monetary award, both to compensate the plaintiff for harm that is difficult to quantify, namely the loss of its goodwill with M & I, and to provide some deterrence for future violations by Fourth Dimension. Given the modest amount of actual damages calculated above, I find that a trebling of the actual damages is necessary

12. This provision is included to ensure that the injunction only reaches deceptive speech—according to the parties themselves, there is no guarantee that the false statements will remain false after the three year period.

13. Although I recognize that damages for corrective advertising can be awarded "regardless of

whether [the] advertising undertook expressly to rebut that claim," *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 997 F.2d 949, 952 (D.C.Cir.1993), the corrective advertising also must be reasonable and causally related to the false advertising. For its post-February actions, Mobius has failed to meet its burden to show these two elements.

to compensate Mobius for its loss of goodwill with M & I and to provide properly for deterrence of Fourth Dimension from committing further acts of wilful bad faith violations of § 43(a). The damages award, therefore, will be $21,008.80 × 3 = $63,026.40. Such an award serves the goal of discouraging violations of the Act, without being so large as to constitute a penalty. *See Otis Clapp & Son, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738, 744 (7th Cir.1985).[14]

### 3. Attorney Fees

Under § 35 of the Lanham Act, a district court is empowered to award attorney fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117(a). A finding of deliberate, wilful or bad faith violations of the Lanham Act is sufficient to warrant the finding of an exceptional case. *See Quaker State Oil Refining Corp. v. Kooltone, Inc.,* 649 F.2d 94, 95 (2d Cir.1981). Indeed, a district court that fails to at least consider an award of attorney fees after a finding of bad faith abuses its discretion. *See Goodheart Clothing v. Laura Goodman Enterprises,* 962 F.2d 268, 272 (2d Cir.1992). In the instant case, I find an award of attorney fees appropriate. Once again, a particular need for deterrence is present in this case because of the defendant's bad faith violation of the Act and its prior settlement agreement. Moreover, in the interests of fairness, Mobius should not be forced to bear the burden of its attorney fees to challenge many of the same issues that it already had litigated successfully. Mobius should submit affidavits concerning its legal bills for this action by December 30, 1994. Fourth Dimension will have the

opportunity to respond to Mobius's submissions, if it wishes, by January 15, 1995.

### 4. Costs

Section 35 of the Lanham Act, 15 U.S.C. § 1117, specifically provides for the assessment of costs as a part of the damages calculation. Costs of this action, as defined by 28 U.S.C. § 1920, therefore, shall be taxed against defendant pursuant to § 35 of the Lanham Act and Fed.R.Civ.P. 54(d).

### *CONCLUSION*

Having found that defendant, Fourth Dimension Software, Inc., wilfully and in bad faith violated both the settlement agreement it had with plaintiff, Mobius Management Systems, Inc., and § 43(a) of the Lanham Act, I conclude the following: (a) an injunction will issue prohibiting defendant from stating, exactly or in substance, those statements that have been determined to be false; (b) Mobius suffered $21,008.80 in quantifiable actual damages; (c) that amount appropriately is trebled under § 35 of the Act for a total of $63,026.40; (d) plaintiff is entitled to the amount of its reasonable attorney fees incurred during this litigation; and (e) costs of this action will be assessed against defendant.

SO ORDERED.

---

**14.** As an additional basis for the enhancement of the actual damages that were readily calculable, I find that an award of punitive damages is appropriate under plaintiff's common law unfair competition claim. Punitive damages in a New York unfair competition claim are available "where a defendant's conduct has constituted 'gross, wanton, or wilful fraud or other morally culpable conduct' to an extreme degree." *Getty Petroleum Corp. v. Island Transportation Corp.,* 878 F.2d 650, 657 (2d Cir.1989) (quoting *Smith v. Lightning Bolt Productions,* 861 F.2d 363, 371 (2d Cir.1988) (quoting *Borkowski v. Borkowski,* 39 N.Y.2d 982, 387 N.Y.S.2d 233, 233, 355 N.E.2d 287, 287 (1976))). The Court of Appeals

has noted that "New York law clearly permits punitive damages where a wrong is aggravated by recklessness or willfulness, ... whether or not directed against the public generally...." *Id.* (quoting *Roy Export Co. v. CBS, Inc.,* 672 F.2d 1095, 1106 (2d Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982)). Given the degree of intentional conduct and bad faith exhibited in this case by Fourth Dimension, and recognizing that the defendant's conduct demonstrates that some sort of deterrence is necessary to avoid further violative conduct, I find that trebling the amount of actual damages calculated is an appropriate amount of penalty to impose on Fourth Dimension.